# 11-5384-cr

## United States Court of Appeals

*for the*

## Second Circuit

---

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

CAMERON DOUGLAS,

*Defendant-Appellant,*

KELLY SOTT, EDUARDO ESCALERA, DAVID ESCALERA,

*Defendants.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX FOR DEFENDANT-APPELLANT

PAUL L. SHECHTMAN
ZUCKERMAN SPAEDER LLP
1185 Avenue of the Americas, 31st Floor
New York, New York 10036
(212) 704-9600

– and –

NICHOLAS M. DE FEIS
ALLISON S. MENKES
DE FEIS O'CONNELL & ROSE, P.C.
500 Fifth Avenue, 26th Floor
New York, New York 10110
(212) 768-1000

*On the Brief:*
  PAUL L. SHECHTMAN
  NICHOLAS M. DE FEIS
  ALLISON S. MENKES

*Attorneys for Defendant-Appellant*

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ................................................................. ii

JURISDICTIONAL STATEMENT ...................................................... 1

ISSUE PRESENTED............................................................................ 1

PRELIMINARY STATEMENT ........................................................... 1

INTRODUCTION ................................................................................ 1

FACTUAL BACKGROUND................................................................ 2

    A.    Cameron's 2009 Arrest and Prosecution ............................................ 2

    B.    The Xanax Incident............................................................. 6

    C.    The Suboxone/Heroin Incident ........................................... 6

    D.    Sentencing Submissions....................................................... 9

    E.    The Pre-Sentence Report.................................................... 13

    F.    Cameron's December 21, 2011 Sentencing for Drug Possession .... 14

ARGUMENT ...................................................................................... 17

CAMERON DOUGLAS' SENTENCE WAS UNREASONABLE ..................... 17

    A.    Sentencing Guidelines....................................................... 21

    B.    Substantive Unreasonableness .......................................... 23

CONCLUSION................................................................................... 33

i

# TABLE OF AUTHORITIES

**PAGE**

## CASES

Gall v. United States, 552 U.S. 38 (2007) ............................................................20

United States v. Ahmed, 324 F.3d 368 (5th Cir. 2003)..........................................22

United States v. Booker, 543 U.S. 220 (2005) ......................................................18

United States v. Bradley, 2012 WL 1130271 (7th Cir.)...................................26, 27

United States v. Enriquez, 42 F.3d 769 (2d Cir. 1994) .........................................22

United States v. Gomez, 845 F. Supp. 103 (E.D.N.Y. 1994)................................25

United States v. Griffin, 310 F.3d 1017 (7th Cir. 2002)........................................22

United States v. Leonard, 50 F.3d 1152 (2d Cir. 1995) ........................................21

United States v. Maier, 777 F. Supp. 293 (S.D.N.Y. 1991) ..................................24

United States v. Medley, 313 F.3d 745 (2d Cir. 2002)............................................5

United States v. Mills, 66 Fed. Appx. 273 (2003)............................................ 28-29

United States v. Nix, 415 Fed. Appx. 981 (11th Cir. 2011)............................17, 31

United States v. Pope, 554 F.3d 240 (2d Cir. 2009).................................17, 30, 31

United States v. Radke, Dkt. No. 99-cr-00413 (S.D.N.Y.) ...................................30

United States v. Rattoballi, 452 F.3d 127 (2d Cir. 2006).......................... 18-19, 27

United States v. Ressam, 2012 WL 762986 (9th Cir.) ...........................................20

United States v. Restrepo, 936 F.2d 661 (2d Cir. 1991).........................................22

United States v. Rigas, 583 F.3d 108 (2d Cir. 2009)..............................................20

ii

United States v. Rossi, 422 Fed. Appx. 425 (6th Cir. 2011) ........................... 17, 31

United States v. Sindima, 488 F.3d 81 (2d Cir. 2007) .......................................... 26


## STATUTES & RULES

18 U.S.C. §1791 ......................................................................................... 1, 8, 28

18 U.S.C. §3231 ................................................................................................... 1

18 U.S.C. §3553(a) ..................................................................................... 18, 19-20

21 U.S.C. §846 ..................................................................................................... 3

28 U.S.C. §1291 ................................................................................................... 1

U.S.S.G. §3E1.1 ........................................................................................... passim


## OTHER AUTHORITIES

A. Gopnik, The Caging of America, The New Yorker Jan. 30, 2012 ................... 30

Brecher, Licit & Illicit Drugs (1972) ............................................................. 23-24

Lewis, Memoir of an Addicted Brain .............................................................. 24, 25

BJS' Federal Justice Statistics Program ............................................................. 28

The Federal Bureau of Prisons' Drug Interdiction Activities,
      January 2003 .............................................................................. 26, 27-28

## JURISDICTIONAL STATEMENT

Cameron Douglas appeals from a judgment of conviction entered on December 21, 2011, in the United States District Court for the Southern District of New York (Berman, J.). The district court had jurisdiction under 18 U.S.C. §3231. This Court has jurisdiction under 28 U.S.C. §1291. This appeal was timely noticed.

## ISSUE PRESENTED

Whether Cameron Douglas' 54-month sentence for possessing personal use amounts of illegal drugs while in federal prison was unreasonable.

## PRELIMINARY STATEMENT

On October 20, 2011, a one-count information was filed in the Southern District of New York, charging Cameron Douglas with possessing a narcotic drug (heroin) and a schedule III controlled substance (Suboxone), in violation of 18 U.S.C. §§1791(a)(2) and (b)(1). That same day, Cameron pleaded guilty to the charge. On December 21, 2011, he was sentenced to 54 months' imprisonment to run consecutively to his original sentence for distributing drugs (50 months) and possessing heroin while on pre-trial release (10 months).

## INTRODUCTION

This appeal concerns the reasonableness of the 54-month sentence that was imposed on Cameron Douglas for possessing user amounts of Suboxone and heroin while a federal inmate. The sentence was a substantial upward variance

from the Sentencing Guideline range, which the district court calculated as 24 to 30 months. It was 450 percent higher than the sentence recommended by the Probation Office (366 days). It was at least 225 percent higher than the sentence recommended by the government (no more than 24 months). It came on top of the harsh punishment that the Bureau of Prisons had imposed for the same conduct -- loss of 80 days good time credit, 11 months of disciplinary segregation and loss of two years of parental visitation. Indeed, it may be the harshest sentence ever imposed on a federal prisoner for a drug possession offense. As discussed below, it is a substantively unreasonable sentence that should be set aside.

## FACTUAL BACKGROUND

A.    Cameron's 2009 Arrest and Prosecution

On July 28, 2009, Cameron Douglas, then 30 years old, was arrested for distributing methamphetamine. According to the complaint, from 2006 to 2009, Cameron had sold the drug in large quantities to two men in Manhattan, who resold it to their customers. At the time of his arrest, Cameron was so visibly high on heroin that he was taken first to the hospital before being brought to court. An addict, he had been shooting heroin five to six times a day for five years. (A. 43).

Following his arrest, Cameron agreed to cooperate with the government. He was then released from custody on the condition that he remain under "house arrest" with a private security guard at his mother's apartment.

2

Within days of his release, Cameron persuaded his girlfriend, Kelly Sott, to smuggle heroin to him, which she hid in an electric toothbrush. When the drug was discovered, his bail was revoked, and he was remanded to the Metropolitan Correctional Center ("MCC"). [1]  Nonetheless, he continued to cooperate, providing detailed accounts of the activities of his California suppliers. He acknowledged distributing 10 to 15 pounds of methamphetamine as well as large quantities of cocaine, more drugs than the government was aware of when it arrested him. (A. 48-51, A. 83-84).

On January 27, 2010, Cameron pleaded guilty, pursuant to a cooperation agreement, to a two-count information. Count One charged him with conspiring to sell more than 500 grams of methamphetamine and five kilograms or more of cocaine, in violation of 21 U.S.C. §846; it carried a mandatory minimum sentence of 10 years' imprisonment. Count Two charged him with possessing heroin while on pre-trial release, a misdemeanor offense. (A. 20-21). Sentencing was subsequently set for April 20, 2010, by which time Cameron had spent eight months in custody. He was drug free during that time -- his longest period of sobriety since age 13. (A. 41, A. 64).[2]

---

[1]     For her role, Ms. Sott was permitted to plead guilty to a misdemeanor and received a "time served" sentence, which was seven months. (A. 24-25).

[2]     As the Court knows, the government's standard practice is to request that a cooperator's sentence be delayed until he has testified. It was believed, however,

3

Prior to sentencing, defense counsel submitted a lengthy memorandum recounting Cameron's long history of substance abuse. The son of actor Michael Douglas and model Diandra Douglas, Cameron grew up with little parental support. While still a young teenager, he drank heavily and began snorting cocaine. He used illegal drugs to self-medicate -- to ward off depression and panic attacks. At 20, he graduated to intravenous cocaine and then to heroin. By 25, his life revolved around heroin. His "friends" were fellow users, who gravitated to him because of his access to family money, which supported their habits. (A. 43-44). In 2006, Cameron's heroin habit led to his being fired from a movie in which he had a minor role. Exasperated, his father gave him an ultimatum: enter a drug rehabilitation program or have his access to family money sharply limited. Cameron declined to enter treatment; his father carried out his threat; and Cameron turned to drug dealing to support his habit. (A. 44).

After reviewing the defense submission and the government's 5K1.1 letter, which detailed Cameron's "tremendously valuable" cooperation, the court sentenced Cameron to 60 months' imprisonment: 50 months on the drug

---

that Cameron's suppliers may have fled to Mexico when word of his arrest inadvertently became public. (A. 84). For that reason, his sentencing went forward even though he had yet to testify.

4

distribution count and 10 months on the heroin possession count.[3]  In fixing

sentence, the court noted "the inevitable negative impact upon society . . . of

dealing serious drugs as Cameron has done."  (A. 94); see also (A. 95)("we all

need to get over the theme that Cameron Douglas is a victim").  And it said this

about the numerous letters it had received from Cameron's family and supporters:

> The letters . . . describe the troubled and troubling
> background of Mr. Douglas including his severe abuse of
> drugs and alcohol starting at the age of 13, and perhaps
> earlier.  They also describe several attempts at rehab
> combined also with his anxiety and depression disorders
> . . . . They describe also his privileged and public family
> background but also reflect problematic parenting . . .
> parental immaturity and drug and alcohol abuse in the
> immediate or extended families.  They also point out that
> Cameron Douglas has lots of friends and supporters and
> resources -- including, certainly, financial resources --
> who believe that he has finally bottomed out in terms of
> his addiction and may be ready to turn his life around and
> do what is needed to accomplish sobriety.  In my
> estimation that will be a very difficult chore.  And I do
> say this sincerely:  That I think this case and this
> sentencing may well be his last chance to make it.

(A. 93)(emphasis added).  As part of the sentence, the court recommended that

Cameron "be able to participate in the Bureau of Prisons drug program sometimes

referred to as RDAP when he becomes eligible to do so."  (A. 119).[4]

---

[3]    The government's 5K1.1 letter allowed the court to impose a sentence less
than the statutory minimum.  See e.g., United States v. Medley, 313 F.3d 745, 749
(2d Cir. 2002).

[4]    The Residential Drug Abuse Program ("RDAP") is the Bureau of Prisons'
only comprehensive drug treatment program.  An inmate is eligible to enter RDAP

5

B.     The Xanax Incident

        In April 2010, while Cameron was at the MCC awaiting sentencing,
an associate at a law firm that was then assisting in representing him began
bringing him Xanax, an anti-anxiety drug.[5]  The associate smuggled the drug into
the facility in her bra on three or four occasions during legal visits. (A. 145-46).
In all, Cameron received approximately 30 pills, some of which he shared with
other inmates.  (A. 134).  An inmate apparently tipped prison authorities to what
had occurred, and in January 2011, after Cameron had been transferred from the
MCC to FCI Lewisburg, the associate was arrested.[6]

C.     The Suboxone/Heroin Incident

        In August 2011, Cameron was brought back to the MCC from
Lewisburg to be a witness for the government in the trial of David Escalera, one of

───────────────

when he has 27 months remaining on his sentence.  RDAP has two phases: a nine-
month "therapeutic community" component in which an inmate receives individual
and group therapy and a six-month "aftercare" component, during which he is
released to work in the community under active supervision.  (A. 66).  Defense
counsel had requested that the court sentence Cameron to 42 months'
imprisonment, which (with credit for time served) would have made him
immediately eligible for RDAP.  (A. 66-67).

[5]     While at the MCC, Cameron was administered Buspar for his anxiety, and
the drug was ineffective.  His lawyers had asked that he be allowed to take
Klonopin, but the request was denied.  (A. 207).  Klonopin and Xanax are both
benzodiazepines and are used to treat panic disorders; Buspar is an azapirone used
to treat generalized anxiety disorders.

[6]     The charge against the associate was subsequently dismissed pursuant to a
deferred prosecution agreement; she was 33 years old at the time of the incident
and apparently became enamored of Cameron during frequent visits.  (A. 127).

6

his methamphetamine suppliers.  Cameron testified for two days, and Escalera was convicted.[7]  On October 16, shortly after the jury's verdict, officers at the MCC searched Cameron's cell and discovered "a powdery substance [on a piece of paper] that field tested positive for cocaine and an orange rock-like substance, very small, that field tested positive for opiates."  (A. 157).  A urinalysis was also conducted, and Cameron tested positive for opiates.  At the time, Cameron was scheduled to testify in the trial of Eduardo Escalera, another supplier, which was then set for October 24.

Because of the imminent trial date, a meeting was arranged with the prosecutors in the Escalera case, and Cameron admitted his wrongdoing.  The orange rock-like substance, he explained, was Suboxone, a methadone-like drug which is used to facilitate withdrawal from heroin.[8]  Cameron had obtained it in Lewisburg and brought it with him to the MCC.  The powdery substance was heroin, not cocaine, which Cameron first claimed he found in the television room and later on the chapel floor.  He told the prosecutors that he did not know how the heroin had been smuggled in.  (A. 193).

---

[7]    Although still subject to a cooperation agreement, Cameron testified pursuant to an immunity order.  That peculiar arrangement apparently reflected the fact that he had potential criminal exposure for the Xanax incident.  (A. 135-37).

[8]    Approved by the FDA in 2002, Suboxone is used for detoxification and long-term replacement therapy for opioid dependency; it is a Schedule III drug.

7

On October 20, 2011, Cameron pleaded guilty to a one-count information, charging him with possessing (i) a narcotic drug and (ii) a schedule III controlled substance (Suboxone) while a federal prisoner, in violation of 18 U.S.C. §§1791(a)(2) and (b)(1). (A. 18). The plea agreement included a stipulated guideline range of 12 to 18 months.[9] In the agreement, the government reserved the right "to seek an enhancement for obstruction of justice" if it determined that Cameron had engaged in obstructive conduct. (A. 152). During the plea colloquy, Judge Berman expressed his dismay that illegal drugs were available in federal facilities. (A. 158).[10]

---

[9] The guideline range was calculated as follows: 13 levels because the "object" possessed was a narcotic drug (§2P1.2(a)(2)) - 2 levels for acceptance of responsibility (§3E1.1(a)) = an Offense Level of 11. Cameron had six criminal history points, which put him in Category III. In 2005, he pleaded guilty to possessing heroin and crack cocaine (1 point). And in 2009, as discussed above, he was convicted of distributing methamphetamine and cocaine and sentenced to 60 months' imprisonment (3 points). Because the instant drug possession offense occurred while he was serving his sentence, two additional points were added pursuant to §4A1.1(d). Offense Level 11 and Criminal History Category III results in a guideline range of 12 to 18 months.

[10] Judge Berman said this:

> THE COURT: . . . You know maybe I am naïve. When I send somebody to the MCC or the MDC or Lewisburg I have an expectation that those places are well managed, safe, that this kind of unlawful behavior doesn't go on. Is that wrong or are you all doing some investigation? This is the second incident involving the MCC in a matter of weeks and Mr. Douglas. So is somebody investigating what goes on at the MCC? . . . [M]y question is, is this stuff that gets smuggled in or does one get this stuff at

8

Within a week of the plea, another MCC inmate came forward and discredited Cameron's story about finding the heroin on the chapel floor. On arriving at the MCC from Lewisburg, Cameron had befriended the inmate and asked him if he knew a source for heroin. On October 15, the inmate gave Cameron a small quantity of heroin, which had been smuggled into the jail. According to the inmate, the heroin found in Cameron's cell the next day was the residue of that delivery. (A. 192-93).[11]

D. Sentencing Submissions

On December 8, 2011, defense counsel submitted a sentencing memorandum to the court in connection with Cameron's new case. The memorandum noted that Cameron had already been punished harshly for his possession of "user quantity" amounts of drugs.[12] After two separate disciplinary hearings (one for his "dirty urine" and the other for possessing illegal drugs), he had lost 80 days of good time credit, been confined to "disciplinary segregation"

---

> the MCC and at Lewisburg? And if it's smuggled in, who is bringing it in?

(A. 158-59).

[11] On October 27, with the cooperating inmate's assistance, the man who had smuggled in the heroin -- Philip Hernandez -- was arrested. (A. 193). Hernandez has yet to be sentenced.

[12] A drug analysis showed that Cameron possessed .028 grams of Suboxone and a trace amount of another drug, which proved to be too small for testing. (A. 192).

for 11 months, and lost family visits for two years. (A. 213). [13] The submission also included a letter from Dr. Carol Weiss, a drug addiction specialist, which sought to explain Cameron's self-destructive behavior. Dr. Weiss told the court that Cameron was suffering from opioid protracted abstinence syndrome after his years of heroin use:

> Protracted Abstinence Syndrome, a phenomenon well documented in the medical scientific literature, is the primary cause of relapse in long term opioid users . . . . That syndrome, characterized by craving, malaise, anxiety, and depression, describes the state of long term opioid users whose internal opioid synthesis and metabolism has been permanently damaged. Even drug free, such long term users are biologically opioid deficient for many years after detoxification, in the same way an individual with an underactive thyroid gland is thyroid deficient without external thyroid hormone. Mr. Douglas, who has been opioid dependent for over seven years, is a classic example of a long term user who has damaged his body's ability to produce natural opioids. The powerful biological drive to correct this chemical deficiency can last for many years after detoxification, leading to a high risk of relapse, and is the rationale behind the practice of opioid maintenance with methadone or Suboxone.

---

[13]   A corrections expert submitted an affidavit describing "disciplinary segregation," as a 23-hour "lockdown." According to the affidavit, an inmate in disciplinary segregation is confined to a cell in the institution's Special Housing Unit ("SHU"). He is allowed outside for one hour a day in a 20 yard by 15 foot cage isolated from other inmates. He is permitted only one telephone call a month. (A. 225-26). The expert averred that Cameron's 11-month segregation was extraordinary. (Id.)("the only situation I can think of where such a long term was imposed involved an inmate who stabbed another inmate with a prison-made knife").

10

(A. 242). The submission also noted that prosecutions for possessing drugs in prison were rare -- that most such cases are handled administratively. (A. 212-14). It concluded by urging the court not to impose additional punishment for Cameron's possessory crime. (A. 217)("punishment beyond that already meted out administratively [is] not . . . necessary to promote respect for the law").[14]

On December 14, 2011, the government filed its sentencing submission, which asked the court to impose a sentence "at the high end of the advisory range." (A. 191). That range, the government argued, was 18 to 24 months' imprisonment -- two levels higher than the stipulated range in the plea agreement due to "the post-plea discovery that Douglas [had] obstructed justice by providing false information to the Government about how he came to possess heroin." (A. 194). Noting that Cameron had repeatedly violated the rules of the Bureau of Prisons and obstructed its investigation of drug smuggling at the MCC,

---

[14]    Defense counsel also submitted a letter from Cameron, which said this:

> In addition Your Honor, I have been battling this disease
> of addiction, as you know, for more than half of my life.
> This affliction has single handedly robbed me of a life
> that should of and could have been rife [sic] in promise,
> fulfillment and great accomplishment. Nobody is more
> acutely aware of the devastation and waste that I have
> suffered by my own hand than myself.

(A. 188).

11

the government told the court that this was "not the run-of-the-mill contraband possession case." (A. 198).

On December 15, after receiving the submission, the court held a telephone conference to "discuss the upcoming sentencing." (A. 253). At the conference, the court requested the government to make a written submission as to why the defendant was entitled to a "deduction of two offense levels . . . for acceptance of responsibility" given his obstructive conduct. (A. 256). In requesting the submission, the court suggested that there seemed to be an "inconsistency in this case." (Id.) Later that day, the government submitted a letter to the court "explain[ing] its current position" that Cameron was eligible for an acceptance-of-responsibility credit. The letter said that Cameron had "promptly admitted his [possessory] crime, waived indictment and pleaded guilty" but had "provided false information about the source of his drugs and thereby delayed the Government's efforts to . . . apprehend the individuals responsible for bringing the contraband into the MCC." (A. 262). According to the government, this was therefore "an extraordinary case where adjustments under Sections 3E1.1 [acceptance of responsibility] and 3C1.1 [obstructive conduct] [were] warranted." (A. 263).[15]

---

[15]    On December 16, defense counsel wrote the court stating his agreement "with the government's analysis as to the continued applicability of

12

E.    The Pre-Sentence Report

         In his probation interview, Cameron acknowledged that he had

obtained one pill of Suboxone while in Lewisburg in approximately July 2011.  At

the time, he was anxious about having to testify against the Escaleras at their

upcoming trial.  He had used the pill in small increments and brought what was left

with him when he was moved to the MCC.    Cameron also acknowledged

possessing heroin in the MCC.  He expressed remorse for his conduct, noting that

he had been drug-free for a significant amount of time before the incident and now

had clearly "slip[ped]."  (PSR 12/13/11 at 6).

         After    reviewing    Cameron's    history,    the    Probation    Office

recommended a sentence of 366 days' imprisonment to run consecutively with his

60-month sentence for distributing drugs.  It wrote this:

> Douglas' conduct is, unfortunately, not uncommon in
> institutional settings, and appears simply to be a
> "moment of weakness" in which he could not resist the
> opportunity to obtain, and use, illicit substances.  While
> his conduct does not represent the same harm as the
> underlying drug-distribution activity for which he is
> incarcerated, he clearly used poor judgment in possessing
> serious contraband in prison . . . .  [H]is actions in this
> offense have clearly set him back, deferring his eligibility
> for RDAP treatment, and extending his release date
> through the loss of good conduct time.  Considering that
> the BOP has imposed severe sanctions, including 11
> months' in disciplinary segregation and long-term loss of

U.S.S.G. §3E1.1."  (A. 264).  At the same time, counsel informed the court that
Cameron did not oppose the obstruction enhancement pursuant to §3C1.1.

13

visiting privileges, we believe that a sentence [of 366 days] . . . is sufficient to address the sentencing objectives of deterrence and promotion of respect for the law.

(Id. at 21).

F.    Cameron's December 21, 2011 Sentencing for Drug Possession

Before calling on the parties to speak, the court gave lengthy remarks, which span 20 pages. (SPA. 2-21). It made clear that it viewed the case as "an unusual situation as it is a sentencing in the middle of a current sentence." And it described Cameron as a defendant who "has . . . by all measures . . . been continuously reckless, disruptive and non-compliant notwithstanding [his] co-occurring addictions and mental health issues, which are no doubt serious." (SPA. 4). It then turned to the sentencing guideline calculation and rejected "as a legal matter" the government's position that an acceptance-of-responsibility credit was warranted. (SPA. 9-10)("the government frankly surprised me [by arguing] that Douglas should be entitled to acceptance of responsibility credit"). On that basis, it calculated the advisory sentencing range as 24 to 30 months.

After calculating that range, the court "hasten[ed] to add [that] irrespective of the . . . Guideline range," it believed that there were grounds for a "higher level of incarceration" in light of Cameron's "history of reckless behavior." (SPA. 12). It then chronicled that history, focusing especially on the Xanax incident, of which it said this:

14

I learned after the fact that Mr. Douglas had convinced
one of his attorneys, an associate . . . at one of New
York's leading . . . law firms, to smuggle contraband,
32.5 milligrams of . . . Xanax -- apparently in her bra to
him in the MCC. The government and the defense,
although in my view this was a serious matter, . . . agreed
. . . that it was in the public interest to dismiss the
complaint against [the associate] and that happened as a
result of a deferred prosecution agreement . . . .   That
case was never presented to me until it was over which
surprises me somewhat.    So, this caper . . . started,
apparently, just before Mr. Douglas' sentence in April
2010, and it does not appear that although this was a
most serious infraction that it resulted in any Bureau of
Prisons administrative action against Mr. Douglas . . . .
There is no record of Douglas having been cited or
sanctioned, as I say, by BOP for possessing the Xanax
pills.   I am constrained to say, sorry to say that this
incident seems to me was swept under the rug both by the
government and the defense.

(SPA. 15-16); (SPA. 15)(the court:  Mr. Douglas "has been totally reckless in his

continued pursuit of drugs").

    After reviewing these events, the court told the parties that Cameron

had "blown the biggest opportunity of his life" and that it was "facile . . . to say

[he] ha[d] been punished enough."    (SPA. 18-19).   It announced that it had

"[n]ever encountered a defendant who has so recklessly and wantonly and

flagrantly and criminally acted in as destructive and . . . manipulative a fashion as

15

Cameron Douglas has." (SPA. 18). Only then did it ask the parties if they wanted
to be heard.  (SPA. 22).[16]

Defense counsel spoke at length but did little to change the court's
view. (SPA. 27)(the court:  "what is really important is not to get warm and
fuzzy").  For its part, the government defended its position that an acceptance-of-
responsibility credit was warranted ("those two points are warranted"); disagreed
with the court's statement that the Xanax incident had been "swept under the rug"
("I do think [that characterization] is unfair"); and emphasized that although it
would not be calling Cameron as a witness at Eduardo Escalera's trial, that fact
should not be "consider[ed] . . . when imposing sentence here."  (SPA. 53-55).[17]

After hearing from the parties, the court imposed a consecutive
sentence of 54 months' imprisonment to be followed by three years' supervised
release, saying this:

> I incorporate everything I said before but, as a quick
> summary, defendant continues and has continued to

---

[16]    The court also noted that Cameron had several prison disciplinary violations
unrelated to drugs:  one for refusing to obey an order and being unsanitary and
untidy, for which he lost 45 days' commissary privileges; one for possessing an
unauthorized item -- a lighter -- for which he lost 90 days' commissary privileges;
one for being absent for an assignment, for which he lost 30 days' commissary
privileges and 60 days' visiting privileges; and another for being absent for an
assignment, for which he lost 90 days' commissary privileges.

[17]    In response to the prosecutor's last point, the court made clear that it was
"not considering the fact that [Cameron] is not going to be a witness at the Eduardo
Escalera trial in factoring . . . the sentence."  (SPA. 56).

16

> engage in a pattern of reckless, criminal, dangerous, destructive, deceitful conduct even after being afforded a last chance in the sentence imposed by the Court in April 2010 by, among other things, failing to abide by the rules and regulations of the prison facilities and by possessing and using unauthorized and illegal substances and by taking advantage of personal relationships in order to obtain unauthorized substances . . . . I am recommending that the Bureau of Prisons lift, immediately, its restrictions on family visits . . . . [T]his restriction, in my respectful judgment, is counter-productive.

(SPA. 57-58). The court also stated that it was "fully aware [of the] sanctions already imposed . . . by the Bureau of Prisons [and that] in fact [the sentence] would be greater if they had not been imposed." (SPA. 19-20).[18]

Cameron is currently in disciplinary segregation at FCI Loretto; he has not had a visit with anyone other than his counsel since early October 2011.

## ARGUMENT

### CAMERON DOUGLAS' SENTENCE WAS UNREASONABLE

Cameron Douglas was sentenced to 54 months' imprisonment for possessing user amounts of heroin and Suboxone while incarcerated at the Metropolitan Correctional Center. His sentence may be the longest ever imposed on a federal inmate for such a crime. While we recognize that many of the words that the district court used to describe Cameron's conduct -- "reckless,"

---

[18] To support an upward variance, the court cited three cases: United States v. Rossi, 422 Fed. Appx. 425 (6th Cir. 2011); United States v. Pope, 554 F.3d 240 (2d Cir. 2009); and United States v. Knicks [sic], 415 Fed. Appx. 981 (11th Cir. 2011). Those cases are discussed infra at 30-31.

17

"manipulative," "destructive" -- were apt, the simple truth is that Cameron Douglas is a heroin addict who has yet to shake his habit. As the district court put it, he suffers from "co-occurring addictions and mental health issues which are, no doubt, serious." (SPA. 4). On the record of this case, a 4 1/2 year sentence for craving opiates, especially when that sentence is coupled with the significant punishment already imposed by the BOP, is unreasonable and should therefore be set aside.

The controlling legal principles are well established. After Booker, this Court reviews a district court's sentencing decision for reasonableness. United States v. Booker, 543 U.S. 220, 260-61 (2005). Reasonableness review has two components: "(1) procedural reasonableness, whereby [the Court] consider[s] such factors as whether the district court properly . . . identified the Guidelines range . . . and (2) substantive reasonableness, whereby [the Court] consider[s] whether the length of the sentence is reasonable in light of the factors outlined in 18 U.S.C. §3553(a)." United States v. Rattoballi, 452 F.3d 127, 131-32 (2d Cir.

2006). [19] In evaluating a sentence's substantive reasonableness, an appellate court

must "consider the extent of [the sentence's] deviation from the Guidelines."

---

[19] Section 3553(a) provides, in pertinent part, as follows:

> The court shall impose a sentence sufficient, but no greater than necessary, to comply with the purposes set forth in paragraph (2) of the subsection. The court, in determining the particular sentence to be imposed, shall consider --

> (1)    the nature and circumstances of the offense and the history and characteristics of the defendant;

> (2)    the need for the sentence imposed --

>> (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

>> (B)    to afford adequate deterrence to criminal conduct;

>> (C)    to protect the public from further crimes of the defendant; and

>> (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

> (3)    the kinds of sentences available;

> (4)    the kinds of sentence and the sentencing range established [and recommended by the Sentencing Guidelines];

> (5)    any pertinent policy statement . . . issued by the Sentencing Commission . . . ;

Gall v. United States, 552 U.S. 38, 38 (2007). A court should require "a more

significant justification" where the variance is "major." Id. at 50.

Of course, the standard for reviewing a sentence is deferential. But as

this Court has emphasized, that deference is not total:

> To say that a sentence is "substantively unreasonable" is
> not to say that "no reasonable person" would have
> imposed such a sentence. We may generally assume that
> federal judges are "reasonable" people in the
> commonsense definition of the term. Nonetheless, even
> reasonable individuals can make unreasonable decisions
> on occasion. The Supreme Court recognizes this and has
> charged the Courts of Appeals with reviewing the
> substance of sentences for reasonableness, and we cannot
> employ a definition of "substantive unreasonableness"
> that would render the required review a dead letter.

United States v. Rigas, 583 F.3d 108, 123 n.5 (2d Cir. 2009); accord United States

v. Ressam, 2012 WL 762986 at *18 (9th Cir.); Id. at *17 (deference "does not

mean anything goes").

Although the focus of this appeal is the substantive unreasonableness

of Cameron's 54-month sentence, we begin with a brief discussion of the

Sentencing Guidelines calculation that the district court employed.

---

     (6)    the need to avoid unwarranted sentence disparities
among defendants with similar records who have
been found guilty of similar conduct; and

     (7)    the need to provide restitution to any victims of the
offense

(18 U.S.C. §3553(a)).

20

A.    Sentencing Guidelines

        The district court concluded that Cameron's obstructive conduct -- his

false statements about how he came into possession of the heroin -- precluded a

downward adjustment for acceptance of responsibility. But, as the government

argued forcefully below, Cameron took responsibility for his own conduct. A trace

amount of some substance was found on a piece of paper in his cell on October 16,

2011, and four days later he waived indictment and pleaded guilty to possessing

heroin. Few, if any, federal cases are resolved so quickly. Moreover, had he not

admitted possessing heroin, the government may not have been able to prove that

he did. The field test, which mistakenly determined that the drug was cocaine, was

too unreliable to satisfy the government's burden of proof. And there was too little

residue to permit a laboratory test to be performed. It is therefore not surprising

that the government relied principally on Cameron's admission to make its case.

Simply stated, where, as here, a defendant has promptly admitted his own guilt,

acceptance points should not be denied. See United States v. Leonard, 50 F.3d

1152, 1159 (2d Cir. 1995)("a defendant has satisfied the requirements of [Section

3E1.1(b)(1)] when he has described his own involvement in the crime").

21

That Cameron lied about the source of the heroin and therefore received an obstruction enhancement should not alter that conclusion.[20] In its pre-sentence submission, the government stated it well:

> Application Note 4 [to §3E1.1] recognizes ... that in "extraordinary cases ... adjustments under both §§3C1.1 and 3E1.1 may apply." Based on the current record, it appears that such is the case here. While Douglas obstructed justice in connection with the Government's investigation of how the heroin he possessed entered the Metropolitan Correct Center (the "MCC") and came into his possession, Douglas promptly admitted his crime, waived indictment and pleaded guilty to the charges. It is to Douglas's credit that he promptly admitted his guilt and pleaded to an instrument that charged his entire misconduct.

(A. 262), citing United States v. Enriquez, 42 F.3d 769 (2d Cir. 1994) and United States v. Restrepo, 936 F.2d 661 (2d Cir. 1991).

---

[20]    Although defense counsel did not press the point below, one could question whether Cameron's false statements about how he came into possession of the heroin warranted an obstruction enhancement. As the Commentary to Guideline §3C1.1 makes clear, making a false statement, not under oath, to law enforcement officers does not warrant an obstruction enhancement unless the statement "significantly obstructed or impeded the official investigation or prosecution of the instant offense" or a closely related one. Application Note 5(B) and 4(G). Here, it is difficult to see that Cameron's falsehoods seriously impeded the government's investigation into how heroin was brought into the jail. Had he said nothing, the investigators would have been in much the same place. They would have known that heroin had been smuggled in, but not known who did it. See United States v. Griffin, 310 F.3d 1017, 1023 (7th Cir. 2002)("even the most ... creative lies to law enforcement officers ... must have a detrimental effect upon their efforts to investigate or prosecute the instant offense before the enhancement can apply"); United States v. Ahmed, 324 F.3d 368, 374 (5th Cir. 2003)(the enhancement punishes for impeding an investigation, not for "not aiding in [it]").

If we are correct that Cameron should have received a downward adjustment for acceptance of responsibility, then his Guidelines range should have been no more than 18 to 24 months, which is lower than where the district court put it.

B.    Substantive Unreasonableness

Whatever the Guidelines range, Cameron Douglas' sentence was substantively unreasonable. The district court increased Cameron's sentence because it believed that he was reckless and manipulative. We do not quarrel with that characterization. But Cameron's behavior was the product of the anxiety disorder and drug dependency that have plagued him since his youth. Writing 40 years ago about how taking opiates can become "enslaving," one author put it this way:

> The case histories and the evidence concerning the sorry plight of so many ex-addicts should serve to remind us . . . that the addict seeking to "kick the habit" has far more to contend with than just the short-term withdrawal syndrome. Through the months and years which follow withdrawal, he must continue to contend with the post-addiction syndrome -- the wavering composite of anxiety, depression, and craving that so often leads to drug-seeking behavior and to relapse. When opiates are not available, the syndrome leads to [other addictive behavior] and continues to mold their lives.

23

Brecher, Licit & Illicit Drugs (1972) at 89.[21] As the district court observed at Cameron's initial sentencing in April 2010, kicking a heroin habit is "a very difficult chore."

All three of the incidents that so infuriated the district court are properly viewed in that light. In early August 2009, in the immediate aftermath of his arrest and while withdrawing "cold turkey" from five years of heroin abuse, Cameron asked his girlfriend to smuggle the drug to him while under house arrest. See United States v. Maier, 777 F. Supp. 293, 294 (S.D.N.Y. 1991)("[c]old turkey withdrawal frequently is not effective"). Then, in April 2010, while awaiting sentencing, he persuaded an associate at a law firm to bring him Xanax to control his panic attacks after the BOP declined to provide him the drug. The third

---

[21] In a new book, Marc Lewis, now a neuroscientist, describes his years as a heroin addict this way:

> We shouldn't be surprised that [heroin], a drug with enormous power to generate wellbeing when it is present and craving when it is absent, changes the brain profoundly. A drug that satisfies a kind of psychological hunger, temporarily, then leaves you starved for more of the same . . . . Addictive drugs convert the brain to recognize . . . only one suitor . . . . [T]he world of other things -- of everything else -- becomes dreary. I need[ed] heroin . . . . I [was] nearly lost without it. A boat without a sail. A car without an engine . . . . Everything [was] flat. Until I hit the escape button and [said] "just one more time, let's get some more."

Lewis, Memoir of an Addicted Brain, at 156-60.

24

incident was the most self-destructive. Having been heroin free for 23 months, Cameron obtained Suboxone in Lewisburg and then heroin in the MCC and slipped back to his old ways. See United States v. Gomez, 845 F. Supp. 103, 104 (E.D.N.Y. 1994)("[i]t is well known that even after a period of . . . abstinence, hard-core heroin addicts can be expected to relapse"). When he was arrested, he was on the verge of being eligible to enter the RDAP program and receive much-needed treatment.

All of this conduct was wrongful, but none of it makes Cameron "dangerous," as the district court also described him. If he poses a danger, it is principally to himself. To be sure, Cameron involved others -- his girlfriend and the associate -- in his quest for drugs and showed little concern for their welfare. But addicts are notoriously selfish and exploitive. Lewis at 304 ("drug addiction is enormously ugly, riding as it does on injury to others"). Thus, while Cameron deserved to be punished -- to teach him (and others) that drugs have no place in prison and that he is not above the rules -- a 4 1/2 year sentence for abusing drugs is shockingly long.

In justifying a sentence far in excess of any applicable Guidelines range, the district court cited Cameron's "pattern of reckless, criminal, dangerous, destructive, deceitful conduct even after being afforded a last chance in the sentence imposed by the Court in April 2010 . . . by taking advantage of personal

25

relationships in order to obtain unauthorized substances." (SPA. 57). But much of

what is included in that description is conduct that the Guidelines already capture.

See United States v. Sindima, 488 F.3d 81, 87 (2d Cir. 2007)("[w]hen a factor is

already included in the calculation of the Guidelines sentencing range, a judge who

wishes to rely on the same factor to impose a sentence above . . . the range must

articulate specifically the reasons that this particular defendant's situation is

different from the ordinary situation covered by the Guidelines calculation"). Any

inmate who obtains drugs in prison is reckless and engaged in criminal and self-

destructive acts. Anyone who lies to authorities about the source of those drugs

and therefore receives an obstruction enhancement is deceitful. And in most cases

in which an inmate receives drugs, it is a relative or loved one who brings them in.

See The Federal Bureau of Prisons Drug Interdiction Activities, Jan. 2003, at iii

("inmates' visitors represent the predominant source of drugs entering BOP

institutions"). We recognize that Cameron's pattern of drug-seeking behavior has

been persistent, but not so much as to warrant so outsized a sentence.[22]

Viewed in this light, this case is similar to the recent decision of the

Court of Appeals for the Seventh Circuit in United States v. Bradley, 2012 WL

1130271 (7th Cir.). There, the defendant traveled interstate to have sex with a

[22] Notably, Cameron was sentenced to 10 months' imprisonment for possessing heroin while originally out on bail. (SPA. 13)(the court: "[t]hese matters . . . were already factored in by me into his April 2010 sentence").

26

15-year-old-boy. Although the defendant's Guidelines range was 57 to 71 months

and the government recommended 71 months, the district court imposed a sentence

of 240 months, calling the offense "slightly below the offense of murder" and

noting that it was "calculated" and "involved a lot of thought." In reversing the

sentence as substantively unreasonable, the Seventh Circuit wrote this:

> [T]he district court did not articulate . . . why Bradley's
> journey required more thought than any other person
> crossing a state border with intent to commit the instant
> offense. An above-guidelines sentence is more likely to
> be reasonable if it is based on factors that are sufficiently
> particularized to the individual circumstances of the case
> rather than factors common to offenders with like crimes.
> Here, it is not clear how the individual circumstances of
> the offense were used to calculate Bradley's sentence.

Id. at *3 (citations omitted).

The unreasonableness of Cameron's sentence is especially obvious

when it is compared to those imposed on others who are similarly situated. See

Rattoballi, 452 F.3d at 133-34 ("[d]isparate sentences prompted the passage of the

Sentencing Reform Act and remain its principal concern"). Although the district

court expressed surprise that illegal drugs could be brought into a federal prison,

the reality is far different. The most recent report on the subject concluded that

"illegal drugs are present in almost all . . . BOP institutions, as evidenced by

inmate drug tests, inmate overdoses, drug finds . . . and criminal and administrative

cases lodged against inmates, staff and visitors." See The Federal Bureau of

Prisons' Drug Interdiction Activities, January 2003 at i.  Indeed, drug misconduct charges for all BOP institutions "exceed[] 3,500 annually, which indicates that drugs are regularly entering [BOP] institutions."  Id. at iii.  Almost all of these cases are resolved administratively.  In the five-year period 1997 to 2001, the most recent for which statistics are available, the FBI opened only 791 drug-related cases (an average of 158 a year).  Id. at 13.  The number of actual prosecutions has been even lower, about 80 a year, most of which were brought against "outsiders" who smuggled drugs in.  See BJS' Federal Justice Statistics Program, available at http://bjs.ojp.usdoj.gov/fjsrc/.

Our own research has identified 14 cases in this Circuit since 1990 in which a federal inmate has been charged under 18 U.S.C. §1791 with possessing illegal drugs.[23]  In all 14 cases, the sentence imposed was within or below the Sentencing Guidelines range.  The longest sentence was 37 months in United

---

[23]     The 14 cases were identified this way:  Westlaw was searched for cases since 1990 in the district courts in which the docket sheet showed that defendant was charged with a violation of 18 U.S.C. §1791.  The docket sheets were then further reviewed to determine if the case involved drugs (and not a weapon) and if bail was set for the defendant after his arrest.  If bail was set, it was assumed that the defendant was not already incarcerated at the time of the incident -- i.e., that he was on the outside smuggling drugs in and not on the inside receiving them.  Files for those cases in which the defendant was charged with a violation of 18 U.S.C. §1791 involving drugs and was incarcerated at the time of the incident were then ordered and examined.  The facts of the incidents could be gleaned from the complaint and/or the sentencing submissions.  Only one of the cases reached this Court.  See United States v. Mills, 66 Fed. Appx. 273 (2003).  The 14 cases are summarized in the Addendum.

28

States v. Mills.  There, accompanied by the defendant's three young children, all under age 8, his 71-year-old mother smuggled him two balloons filled with Darvocet and marijuana.  The children were used intentionally to "provide a . . . distraction" for the smuggling.  66 Fed. Appx. at 275.  The defendant swallowed the balloons in the attendant confusion when his children became frightened and began crying.  Because of his criminal history category (VI), his use of his young children in committing the crime (two point enhancement) and his obstruction (swallowing the balloons), the defendant's Guidelines range was 33 to 41 months, and his sentence was mid-range.  Of the remaining 13 defendants, nine received sentences of 18 months or less.  Notably, in at least eight of the 14 cases, there was evidence that the defendant possessed the drugs with intent to distribute them to other inmates.

Cameron's four-and-a-half year sentence is even more extreme when one considers the heavy punishment that the BOP imposed on him for the incident.  As noted above, for possessing heroin in the MCC, the BOP extinguished 80 days of good conduct time (effectively adding that period to his sentence), required 11 months of disciplinary segregation, and took away two years of parental visitations, four years of social visitation and two years of commissary.  That means that for 11 months, Cameron will be confined to his cell for 23 hours a day and permitted only one telephone call every 30 days and no other contact with the

29

outside world. See A. Gopnik, The Caging of America, The New Yorker, Jan. 30, 2012 at 3 ("[l]ock yourself in your bathroom and then imagine you have to stay there for [an extended period] and you will have some sense of the experience"). Surely a reasonable person could conclude that such severe punishment, by itself, is more than a sufficient sanction for Cameron's wrongs.[24]

   The one Second Circuit case that the district court cited to justify its upward variance is easily distinguished. In United States v. Pope, 554 F.3d 240 (2d Cir. 2009), the defendant was sentenced to seven years' imprisonment for two counts of bank burglary, when the Guidelines range was 33 to 41 months. In varying upward, the district court relied on the fact that the defendant had three prior burglary convictions (the first occurring in 1992) and "14 prior convictions, for crimes including attempted manslaughter and grand larceny, for which [he] was not assessed any criminal history points because the offenses were remote in time." Id. at 243. Moreover, the defendant's Guidelines range was low because,

---

[24]  It bears note that in one of the 14 cases discussed above, Judge Barrington Parker, then sitting in the District Court, imposed a two-month sentence on an inmate found in possession of .25 grams of heroin, departing downward, in part, because of "the lengthy [105 days] period spent by the defendant in the 'hole' at F.C.I. Otisville." Judgment of Conviction, United States v. Radke, Dkt. No. 99-cr-00413 (S.D.N.Y.); see also Tr. 6/22/99 at 22-23 ("having heard the arguments about the amount of drugs involved, the consequences within the system of his having been caught with these drugs and the small quantities which both the Government and the defendant concede were amounts for personal use, that constellation of factors amounts to circumstances of a kind not adequately taken into consideration by the sentencing commission").

30

fortuitously, there was little for him to steal -- $1,078 in one bank and $1,165.77 in the other -- after he broke his way in. On this record, a lengthy sentence was warranted "if nothing else . . . to protect the public from Mr. Pope," who "at forty-nine years old" was still at it. Id. at 244. In short, Pope shows that upward variances are warranted in some cases, not that one was called for here.[25]

One final point bears making: Although the district court was correct in stating that Cameron is not a "victim," the sad reality is that professional drug treatment is not available in our federal prisons until an inmate approaches his release. See supra at 4. That means that Cameron was left to struggle with his demons on his own throughout his time at Lewisburg and the MCC. In sentencing Cameron in April 2010 for distributing drugs, the district court was acutely sensitive to the point. It noted that "[w]ithout doubt, the current literature is to the effect that treatment is one of the most important components of sentencing for drug addicts" (A. 96), and it recommended that Cameron "receive medical and drug treatment and therapeutic counseling while incarcerated to the extent it is

---

[25]     The two other cases that the district court cited -- United States v. Nix, 415 Fed. Appx. 981 (11th Cir. 2011), and United States v. Rossi, 422 Fed. Appx. 425 (6th Cir. 2011) -- are also unhelpful. They, too, show only that an above-Guidelines-range sentence is appropriate in some instances.

31

available" (A. 119).[26]   Resource concerns may require the BOP to structure its

treatment programs as it does, but one should not be surprised if an untreated

addict in federal prison still craves drugs.

      In sum, the sentence imposed in this case was substantively

unreasonable.  As noted above, the Guidelines, properly calculated, most likely

called for a sentence of 18 to 24 months.  The Probation Office recommended a

sentence of 366 days.  The government recommended a sentence of no more than

24 months.  And defendants in even roughly comparable cases in this circuit since

1990 have never received a sentence greater than 37 months, and the typical

---

[26]     The district court gave "two cites" that it believed were "helpful":

> I will give you two cites that are helpful, one from the
> National Institute on Drug Abuse, Principles of Drug
> Abuse Treatment for Criminal Justice 2007 publication.
> The quote is this: "Findings show, unequivocally, that
> providing comprehensive drug abuse to criminal
> offenders works reducing both drug abuse and criminal
> recidivism.   Treatment offers the best alternative for
> interrupting the drug abuse criminal justice cycle for
> offenders with drug abuse problems."  And this quote,
> also from the National Institute on Drug Abuse,
> Principles of Drug Addiction Treatment, 2009, the quote
> is:  "Research has demonstrated that treatment for drug
> addicted offenders, during and after incarceration, can
> have a significant effect on future drug use, criminal
> behavior, and social functioning.   The case for
> integrating drug addiction treatment approaches with the
> criminal justice system is compelling."

(A. 96-97).

sentence is 18 months or less.  Nothing in the record of this case justifies the far greater sentence that was imposed on Cameron Douglas.  To borrow this Court's words, even a reasonable judge can make an unreasonable decision on occasion, and this was one.

## CONCLUSION

For these reasons, the sentence should be vacated, and the case remanded for further proceedings.

Dated:   New York, New York
         May 1, 2012

Respectfully submitted,

By:_____

Paul Shechtman
Zuckerman Spaeder LLP
1185 Avenue of the Americas
New York, NY  10036
212-704-9600

Nicholas M. De Feis
Allison S. Menkes
De Feis O'Connell & Rose, P.C.
500 Fifth Avenue, 26th Floor
New York, NY  10110
212-768-1000

Attorneys for Defendant-Appellant

33

**Federal Rules of Appellate Procedure Form 6.**
**Certificate of Compliance With Rule 32(a)**

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1.  This brief complies with the type-volume limitation of Fed. R. App. P.
    32(a)(7)(B) because:

    This brief contains 6,243 words, excluding the parts of the brief
    exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirement of Fed. R. App. P.
    32(a)(5) and the type style required of Fed. R. App. P. 32(a)(6) because:

    This brief has been prepared in a proportionally spaced typeface using
    Microsoft® Office Word 2003, in 14 pt. font size, Times New Roman.

Dated:  May 1, 2012

By:_____

    Paul Shechtman
    Zuckerman Spaeder LLP
    1185 Avenue of the Americas
    New York, NY  10036
    212-704-9600

    Attorney for Defendant-Appellant

34

ADDENDUM

## Addendum

1.      United States v. Beinerman, Dkt. No. 98-cr-415 (EDNY).    While incarcerated, the defendant was caught with cocaine and marijuana.  Although the case file does not reveal the precise amount, a pre-trial letter from the government to defense counsel states that "the government . . . intends to call an expert witness [that] the weight of the controlled substances [are] consistent with distribution." AUSA Adelman letter 5/2/98.   The defendant subsequently pleaded guilty to violating 18 U.S.C. §1791.    His guidelines range was 12 to 18 months' imprisonment based on a criminal history category of III.  Judge Allyne R. Ross imposed a sentence of one year and a day to run consecutively with the sentence the defendant was serving.

2.      United States v. Ben-Shimon, Dkt. No. 99-cr-452 (NDNY).   While incarcerated at FCI Ray Brook, the defendant and another inmate devised a scheme in which a rabbi smuggled to them 12 grams of cocaine and 30 grams of marijuana.  The rabbi was caught attempting to smuggle in two more ounces of marijuana.  The defendant went to trial and was convicted of three counts of 18 USC §1791 and one count of 18 USC §371.  His guidelines range was 27 to 33 months' imprisonment based on a criminal history category of III.  Judge David N. Hurd imposed a consecutive sentence of 27 months' imprisonment.

3.    United States v. Burford, Dkt. No. 99-cr-381 (NDNY).  The defendant participated with Ben-Shimon in the scheme described above.  He pleaded guilty to violating 18 USC §371.  His guidelines range was 37 to 46 months' imprisonment based on a criminal history category of VI.  Judge Thomas A. McAvoy imposed a consecutive sentence of 12 months' imprisonment, departing downward, because of the defendant's cooperation against Ben-Shimon.

4.    United States v. Green, Dkt. No. 95-cr-669 (SDNY).    While incarcerated at Westchester County Jail, the defendant received cocaine and heroin from his wife.  The defendant distributed 13.9 grams of the cocaine and .30 grams of the heroin to another inmate, who was a confidential informant.  The defendant pleaded guilty to violating 21 USC §843.  His guidelines range was 24 to 30 months' imprisonment based on a criminal history category of VI.    Judge Barrington D. Parker, Jr., imposed a consecutive sentence of 30 months' imprisonment.

5.    United States v. Green, Dkt No. 08-cr-210 (NDNY).    While incarcerated at FCI Ray Brook, the defendant was found in possession of a small quantity of marijuana and a plastic knife-like object.  The defendant pleaded guilty to violating two counts of 18 USC §1791. Judge Fredrick J. Scullin, Jr., imposed a consecutive sentence of 18 months' imprisonment.  The defendant's guidelines

2

range and criminal history category could not be determined from the available material.

6.　United States v. Haywood, Dkt No. 95-cr-083 (SDNY).　While awaiting trial at the Metropolitan Correctional Center, the defendant recruited his fiancé to smuggle in a package of marijuana.　The defendant apparently intended to sell the marijuana and use the proceeds to buy his fiancé a gift.　He pleaded guilty to violating 18 USC §1791.　Magistrate Judge Sharon Grubin imposed a sentence of 6 months' imprisonment.　The defendant's guidelines range and criminal history category could not be determined from the available material.

7.　United States v. Hicks et al., Dkt. No. 95-cr-323 (SDNY).　While he was incarcerated at Westchester County Jail, the defendant's sister-in-law smuggled in 130 bags of heroin, many of which he sold to another inmate, who was a confidential informant.　His sister-in-law was subsequently caught when she attempted to smuggle in an additional 130 bags of heroin.　The defendant pleaded guilty to violating 21 USC §843.　His guidelines range was 24 to 30 months' imprisonment based on a criminal history category of VI.　Judge Charles L. Brieant imposed a consecutive sentence of 24 months' imprisonment.

8.　United States v. Lopez, Dkt. No. 96-cr-351 (SDNY).　While incarcerated at the Metropolitan Correctional Center, the defendant was caught hiding a balloon filled with 3.1 grams of marijuana.　Asked where the marijuana

3

came from, the defendant said that he found it on the visiting room floor. The defendant pleaded guilty to violating 18 USC §1791. His guidelines range was 2 to 8 months' imprisonment based on a criminal history category of IV. Judge Allen G. Schwartz sentenced the defendant to time served.

9.     United States v. Lugo, Dkt. No. 94-cr-299 (SDNY). While he was incarcerated at FCI Otisville, the defendant's wife smuggled to him eight glassines of heroin. The defendant was caught with the drugs in the visiting room and swallowed them. (The defendant's wife later said that he had threatened to stop providing financial support if she refused to bring him drugs.) He subsequently pleaded guilty to 21 USC §812, 21 USC §841(a)(1), and 21 USC 841 (b)(1)(c). Judge Kevin T. Duffy imposed a consecutive sentence of 15 months' imprisonment. The defendant's guidelines range and criminal history category could not be determined from the available material.

10.     United States v. Mills, Dkt. No. 01-cr-350 (NDNY). While incarcerated at FCI Ray Brook, the defendant devised a plan for his mother to smuggle to him two balloons filled with Darvocet and marijuana. At his direction, his mother was accompanied by his three children, all under the age of eight, who were used to help avoid detection. The defendant swallowed the balloons in the attendant confusion when his children became frightened and began crying. He subsequently pleaded guilty to violating 18 USC §1791. His guidelines range was

4

33 to 41 months' imprisonment based on a criminal history category of VI. Judge Lawrence E. Kahn imposed a consecutive sentence of 37 months' imprisonment.

11.   United States v. Parker, Dkt. No. 01-cr-439 (NDNY). While he was incarcerated at FCI Ray Brook, the defendant's girlfriend smuggled in 11 balloons filled with heroin. Their plot was uncovered when the girlfriend attempted to pass him a popcorn bag filled with the drugs. The defendant pleaded guilty to violating 18 USC §1791 and §371. His guidelines range was 18 to 24 months' imprisonment based on a criminal history category of IV. Judge David N. Hurd imposed a consecutive sentence of 18 months' imprisonment.

12.   United States v. Parker et al., Dkt. No. 09-cr-162 (NDNY). While incarcerated at FCI Ray Brook, the defendant organized a plan for his brother and friend to smuggle him a small quantity of marijuana. The two accomplices were stopped on prison ground before they could make their delivery. The defendant pleaded guilty to violating 18 USC §1791. Judge Glenn T. Suddaby imposed a consecutive sentence of 10 months' imprisonment.

13.   United States v. Radke, Dkt. No. 99-cr-413 (SDNY). While incarcerated at FCI Otisville, the defendant purchased .25 grams of heroin for his personal use. After the drugs were discovered in the defendant's cell, he was placed in administrative segregation for 105 days. He subsequently pleaded guilty to violating 18 USC §1791. His guidelines range was 24 to 30 months'

5

imprisonment based on a criminal history category of V. Judge Barrington D. Parker, Jr., imposed a consecutive sentence of two months' imprisonment. In departing downward, Judge Parker pointed to the "lengthy period spent by the defendant in the 'hole' at F.C.I. Otisville." Judgment of Conviction at 6; see also Sentencing Tr. 6/22/99 at 22 ("[h]aving heard the arguments about the amount of drugs involved [and] the consequences within the system [a downward departure is warranted]").

14.  United States v. Romero, Dkt. No. 99-cr-328 (EDNY). While incarcerated, the defendant possessed heroin with intent to distribute. He pleaded guilty to 21 USC §846 and 21 USC §841(a)(1). Judge Nina Gershon imposed a sentence of time served. The defendant's guidelines range and criminal history category could not be determined from the available material; the number of sealed entries on the docket suggests that the defendant may have cooperated with the government after his arrest.

SPECIAL APPENDIX

i

**SPECIAL APPENDIX
TABLE OF CONTENTS**

**Page**

Transcript of Sentencing Proceedings held before
the Honorable Richard M. Berman, dated
December 21, 2011, Appealed From ..................... SPA-1

Judgment of the Honorable Richard M. Berman,
dated December 21, 2011, Appealed From............ SPA-63

SPA-1

```
      1CL5douS                    Sentence-CORRECTED
 1    UNITED STATES DISTRICT COURT
 1    SOUTHERN DISTRICT OF NEW YORK
 2    -----------------------------x
 2
 3    UNITED STATES OF AMERICA,
 3
 4              v.                        09 Cr. 1082 (RMB)
 4
 5    CAMERON DOUGLAS,
 5
 6                  Defendant.
 6
 7    -----------------------------x
 7
 8
 8                                   December 21, 2011
 9                                   10:08 a.m.
 9
10
10    Before:
11
11                   HON. RICHARD M. BERMAN,
12
12                                     District Judge
13
13
14                   APPEARANCES
14
15    PREET BHARARA
15         United States Attorney for the
16         Southern District of New York
16    BY:  JUSTIN ANDERSON
17         TIMOTHY SINI
17         Assistant United States Attorneys
18
18    DE FEIS, O'CONNELL & ROSE
19         Attorneys for Defendant
19    BY:  NICK De FEIS
20         ALLISON MENKES
20
21
22
23
24
25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SPA-2

2

1CL5douS                        Sentence-CORRECTED
 1          (Case called)
 2          THE COURT:  Good morning, everybody.
 3          As you know, we are on today for sentencing.  The
 4   rules of sentencing have changed over the years as a result of
 5   Supreme Court decisions and Second Circuit cases, the upshot
 6   being that the United States Sentencing Guidelines are no
 7   longer mandatory.  Rather than looking at mandatory guidelines,
 8   the Courts are directed to review the factors found at 18,
 9   United States Code, Section 3553(a) which I might say I have
10   done before coming on the bench today and so my remarks may
11   take a little bit longer than usual because there is an
12   extensive record and I intend to go through it in some detail.
13   So, those factors include, statutorily, the nature and the
14   circumstances of the offense.  The offense we are talking about
15   here is as follows:
16          At his plea Mr. Douglas said that from May through
17   October 2011, while an inmate in federal custody, I knowingly
18   had in my possession Suboxone and a piece of paper with the
19   remnants of what I believed to be heroin.  That's found at the
20   October 20, 2011 transcript at page 26.  We also considered the
21   history and characteristics of the defendant in this case,
22   among other things he has a drug addiction and also a mental
23   health issues and appears to have had those since his teenage
24   years.
25          He has been a drug dealer as an adult, he was signed
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

SPA-3

3

1CL5douS                    Sentence-CORRECTED
1   as a cooperator by the government and sentenced by me as a
2   cooperator in April of 2010 to five years of incarceration
3   followed by five years of supervised release.  He has been in
4   serious criminal trouble and several times in violation of
5   prison regulations since then.
6           We also seek to accomplish certain objectives in
7   sentencing including the need for the sentence imposed to
8   reflect the seriousness of the offense.  The offense we are
9   considering today is serious, it comes with a 20-year maximum
10  sentence.  We seek to promote respect for the law and here I
11  would have to say that the law has been consistently
12  disregarded by Mr. Douglas.
13          And, to provide a just punishment for the offense.  We
14  also seek to afford adequate deterrence to criminal conduct.
15  In my judgment incarceration is a necessary part since
16  Mr. Douglas has either refused and/or been unable,
17  historically, to respond to other forms of treatment.  We seek
18  to protect the public from further crimes of the defendant and
19  by public I'm here also referring to fellow inmates and prison
20  officials and other third-parties who I will mention.
21          In addition, we seek to provide the defendant with
22  needed educational or vocational training, medical care or
23  other correctional treatment in a most effective manner, and
24  that was done rather extensively in the sentence I imposed, it
25  seems to me, in April of 2010.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

4

1CL5douS                    Sentence-CORRECTED
1           In doing all of this we look at the kinds of sentences
2    that are available, the kinds of sentence and the sentencing
3    range established under the sentencing guidelines even though
4    those are, as I said before, no longer mandatory.  We look at
5    any policy statements issued by the Sentencing Commission that
6    apply.  We seek to avoid unwarranted sentence disparities among
7    similarly situated defendants and, in an appropriate case of
8    which this is not one, to provide for restitution.
9           So, as I say, I have considered the guidelines but
10   also all of the other factors set forth at 18, United States
11   Code, Section 3553(a), and I would say at the outset that this
12   is an unusual situation as it is a sentencing in the middle of
13   a current sentence and it is a sentence of a defendant who has,
14   in my judgment by all measures, been continuously reckless,
15   disruptive and non-compliant, notwithstanding Mr. Douglas'
16   co-occurring addictions and mental health issues which are, no
17   doubt, serious, and also notwithstanding his designation and
18   sentence as a cooperator.
19          So, the 3553(a) analysis is somewhat lengthy and bear
20   with me, it includes the following:
21          Mr. Douglas pled guilty before this Court to this
22   current offense on October 20, 2011 to possession of prohibited
23   objects, Suboxone and a narcotic drug, presumably heroin, while
24   an inmate of the federal prison.  During the plea allocution
25   Mr. Douglas informed the Court that he believed the substance

SPA-5

1CL5douS                    Sentence-CORRECTED
1    other than the Suboxone pill was heroin.
2              According to the presentence report, a BOP staff
3    member entered Douglas' cell after observing that the window of
4    his cell was covered.  Upon entering into his cell Douglas
5    abruptly placed his right hand inside his sweatpants and when
6    asked what was in his right hand, Douglas responded "Nothing."
7    The staff member proceeded to search Douglas and recovered a
8    small piece of paper with white traces of powder on it.
9    Douglas claimed knowing what the powder was.  A further search
10   of the cell recovered an orange, rock-like substance inside a
11   box of cotton swabs.  A field test of the white powder tested
12   positive, apparently, for traces of cocaine.  The orange rock
13   field tested positive for opiates.  Douglas was administered a
14   urinalysis which was positive for opiates.
15             A DEA laboratory report subsequently determined that
16   the orange rock contained a net weight of .028 grams of
17   Suboxone.  The residue on the paper did not test positive for a
18   controlled substance but, in any case, as I said, Douglas pled
19   guilty pursuant to a plea agreement dated October 18, 2011.
20             As I mentioned before, this offense carries a
21   statutory maximum penalty of 20 years of imprisonment to be
22   served consecutively to any other sentence, that is to say
23   consecutive to his current sentence of five years in prison and
24   five years of supervised release.
25             In the same plea agreement the defense and the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

6

1CL5douS                    Sentence-CORRECTED

1   government agreed that the guideline range under the sentencing
2   guidelines was 12 to 18 months and that his criminal history
3   category was III.  That plea agreement also states the
4   following:  The defendant acknowledges that his entry of a
5   guilty plea to the charged offenses authorizes the sentencing
6   Court to impose any sentence up to and including the statutory
7   maximum sentence.  We usually start, and I will turn now to an
8   analysis under the guidelines even though, as I say, these are
9   no longer mandatory.
10              So, the probation department weighs in, as it usually
11  does, and it finds that the guideline range is 12 to 18 months,
12  concludes that the base offense level is 13, it awards no
13  points or decrease, rather, for obstruction of justice, and it
14  does allow for acceptance of responsibility which lowers the
15  sentence based on Mr. Douglas' plea.
16              The defense and the government have a different
17  calculation.  Although they start with a base offense level of
18  13, they do add two levels for obstruction of justice.  When I
19  say "they" I refer now to the letter dated December 16, 2011 in
20  which defense counsel states that the defendant is not seeking
21  a hearing regarding the obstruction of justice enhancement and
22  that he does not impose such an enhancement, thus both the
23  government and the defense agree that Mr. Douglas obstructed
24  justice.  I am going to come back to that in a minute but that
25  obstruction raises his guideline range from 18 to 24 months

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1CL5douS                    Sentence-CORRECTED
1  rather than the 12 to 18 months set forth in the plea
2  agreement.
3          I calculate the range differently and higher.  I agree
4  that the base offense level is 13, that there also should be an
5  obstruction of justice enhancement but I also conclude, as a
6  legal matter, that there should not be any credit for
7  acceptance of responsibility in this case and therefore I
8  determine that the guideline range is 24 to 30 months based on
9  an offense level of 15, the Criminal History Category of III,
10 but I also conclude that a non-guideline sentence is warranted
11 which may vary upward from even the 30 months.
12         So, let's talk a little bit about the obstruction of
13 justice even though there is agreement.  The relevant guideline
14 is United States Sentencing Guidelines 3C1.1 and it is called
15 obstructing or impeding the administration of justice.  Without
16 going into all the detail, application note 4 to that guideline
17 provides examples of the types of conduct to which the
18 adjustment applies and includes providing a materially false
19 statement to a law enforcement officer that significantly
20 obstructed or impeded the official investigation or prosecution
21 of the instant offense.  And in support of that here the
22 government states that within a week of Douglas' plea to the
23 charge in the information that is in this instant matter, the
24 government learned from a cooperating defendant in another
25 matter that Douglas had misled the government about how he

1CL5douS                    Sentence-CORRECTED
1   obtained heroin while in the custody of the Bureau of Prisons.
2           According to the complaining witness, after Douglas
3   arrived at the MCC Douglas immediately sought out a source of
4   heroin asking the complaining witness whether he knew of any
5   such sources.  The complaining witness reported that Douglas
6   found a heroin supplier inside the MCC and that the complaining
7   witness hand-delivered heroin to Douglas on or about October
8   15, 2011, one day prior to the time when BOP staff caught
9   Douglas with drugs in his cell.  The complaining witness
10  explained how the heroin was smuggled into the MCC and the
11  complaining witness' information was corroborated by the arrest
12  of an individual as he attempted to smuggle heroin into the
13  MCC.  The information provided by the complaining witness
14  directly contradicted Douglas' earlier statements to the
15  government about the offense.  Douglas initially lied about
16  where he obtained the drugs saying, first, that it was in a
17  television room and later that it was during a church service.
18  Douglas also claimed that he obtained the heroin by chance
19  picking it up off the floor after another inmate dropped it.
20  He also claimed that he did not know the inmate who dropped it
21  or where the heroin came from.  Douglas insisted that the
22  heroin was not intended for him, he did not order it, he had
23  not previously possessed heroin at the MCC, and he did not know
24  any heroin sources inside the MCC.
25          The government also states that these false statements

9

1CL5douS                    Sentence-CORRECTED

1  impeded the government's investigation of how the heroin
2  possessed by Douglas entered the MCC.
3          So, the Court finds and the parties agree that an
4  enhancement for obstruction of justice increase is certainly
5  warranted in this case.
6          So now, turning to acceptance of responsibility where
7  I appear to disagree with both the government and the defense.
8  One gets acceptance of responsibility credit if the defendant
9  clearly demonstrates acceptance of responsibility for his
10 offense and then he gets a decrease of the offense level by two
11 levels.  The relevant guideline is United States Sentencing
12 Guidelines 3E1.1, it is called acceptance of responsibility.
13 Application note 3 to that guideline states that the entry of a
14 guilty plea, which happened here, prior to the commencement of
15 trial combined with truthfully admitting the conduct comprising
16 the offense of conviction and truthfully admitting or not
17 falsely denying any relevant conduct for which he is
18 accountable under 1B1.3 called relevant conduct, will
19 constitute significant evidence of acceptance of
20 responsibility.  But that's not what happened here.
21          The application note goes on to say that a defendant
22 who enters a guilty plea is not entitled to an adjustment under
23 this section as a matter of right.  And again I say both the
24 government frankly surprised me and the defense agree that
25 Douglas should be entitled to acceptance of responsibility

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

SPA-10

1CL5douS                    Sentence-CORRECTED

1    credit.  I respectfully disagree and do not feel that such
2    credit should be granted by any stretch.
3          So, application note 4 to this guideline states that
4    the conduct resulting in an enhancement under the obstruction
5    of justice section which we have just discussed ordinarily
6    indicates that the defendant has not accepted responsibility
7    for his conduct.  It goes on to say that there may, however, be
8    extraordinary cases in which adjustments under both of those
9    sections may apply, that is to say in an extraordinary case you
10   might obstruct justice but nevertheless get credit for
11   accepting responsibility.
12         I find that this is not an extraordinary case by any
13   stretch of the imagination.  The Court does not find that
14   defendant has accepted responsibility for his criminal conduct.
15   Although Mr. Douglas pled promptly and waived indictment he did
16   not truthfully admit the additional relevant conduct concerning
17   how, where or when he came into possession of prohibited
18   objects -- in this case Suboxone and heroin.  In fact, he did
19   the opposite by lying about contraband, what he believed to
20   be -- what he believed was heroin that he obtained in the MCC.
21   And, as noted by the government in a related case in the case
22   of David Escalera who has already gone to trial, been convicted
23   and in which Mr. Douglas testified, after David -- this is a
24   quote from the government -- after David Escalera's trial
25   Douglas chose not to assist the government with its

SPA-11

11

1CL5douS                Sentence-CORRECTED
1   investigation of how the controlled substances he possessed
2   entered the MCC.
3           This change in Douglas' relationship with the
4   government would undoubtedly affect its decision to continue to
5   seek his testimony in connection with criminal prosecutions.
6   And, for your information, in the remaining case involving
7   Eduardo Escalera, which the trial has not yet taken place, the
8   government has indicated that it does not intend to call
9   Mr. Douglas as a witness, although, as I said before, he signed
10  a cooperation agreement and was sentenced in accordance with
11  that agreement.
12          Mr. Douglas informed probation that he obtained one
13  pill of Suboxone from another inmate at the Lewisburg facility
14  in July 2011.  This is a quote from the party.  Douglas averred
15  that he was spurred to seize the opportunity to obtain Suboxone
16  by feelings of anxiety about having to testify as a witness in
17  an upcoming trial.  Once he obtained the Suboxone and found
18  some relief from using it, albeit in small amounts, he was open
19  to using heroin at MCC when it became available to him.
20          So, I find here that the lies to the government about
21  how, when and where he obtained heroin is inconsistent, in my
22  judgment, with acceptance of responsibility.  And, I hasten to
23  add that in any case, even assuming that Douglas had not lied
24  to the government, the Court does not find and would not find
25  that this is an extraordinary case in which there should be
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

12

1CL5douS                    Sentence-CORRECTED

1  both obstruction and acceptance of responsibility.  So, I am
2  not awarding any acceptance responsibility points.  He was
3  caught with contraband, pretty much end of story.  The cases
4  I'm relying on are United States v. Reed, 49 F.3d 895, (2d Cir.
5  1995).  I'm also relying on United States v. Billings, 263, F.
6  App'X 795 (11th Cir. 2008).  I disagree with the government
7  that United States v. Enriquez, 42 F.3d 769, (2d Cir. 1994) is
8  applicable to the facts of our case here.
9         So, that is my analysis, that the top end of the
10 guideline range is 30 months, unlike what the defense and the
11 government have agreed, but I hasten to add, again irrespective
12 of the United States Sentencing Guideline range, whether the
13 top is 24 months as the government and defense feel or 30
14 months as I feel, the Court believes there is grounds for the
15 defendant to be sentenced to a higher level of incarceration
16 having reviewed the factors at 18, United States Code, Section
17 3553(a), and let me give you some of that additional review.
18         Mr. Douglas has a history of reckless behavior.  He
19 has prior convictions, as I mentioned before, the crimes for
20 which he was sentenced by me in April of 2010 for conspiracy to
21 distribute and possess with the intent to distribute 500 grams
22 and more of crystal methamphetamine and five kilograms and more
23 of cocaine, and to the possession of heroin for which he
24 entered into a cooperation agreement with the government and,
25 as I said, was sentenced as a cooperator by me in April of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SPA-13

13

1CL5douS                    Sentence-CORRECTED
1    2010.  He also had a charge dating back to May 2005, among
2    other things, from an arrest in California, possession of a
3    controlled substance and driving under the influence of
4    alcohol.
5            While on bail for the offenses for which I sentenced
6    him in April for the drug conspiracy, Mr. Douglas violated the
7    terms of his bail conditions by possessing heroin.  You will
8    recall having it smuggled into his mother's apartment in a
9    toothbrush by his friend Kelly Sott.  These matters, I should
10   say that I have just been discussing, were already factored in
11   by me into his April 2010 sentence.
12           In addition, Douglas has an extensive substance abuse
13   and mental health issue history including use of marijuana,
14   cocaine, alcohol, crystal meth, LSD and heroin.  He was
15   snorting cocaine at age 15, using heroin intravenously at age
16   16 or 17, using heroin daily intravenously at age 25.  I think
17   Ms. Sott described in her testimony in the David Escalera trial
18   that at the time of their arrest they, together, had somewhere
19   between $300 and $500 a day, per day, heroin habit.
20           Mr. Douglas also suffers from depression and anxiety
21   and perhaps, according to the submission by Dr. Weiss, other
22   mental illnesses.
23           The government notes in its submission that it has
24   also received reports from inmates that Douglas was seen
25   snorting substances while in the custody of the Bureau of
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

SPA-14

1CL5douS                    Sentence-CORRECTED

1   Prisons.  That's in the government's December 14, 2011 letter
2   at page 2.  According to Mr. Douglas' father, Michael Douglas,
3   defendant had been enrolled in drug treatment programs at least
4   six or seven times although he did not complete most of those
5   programs.  That's found in the presentence report at paragraph
6   69 and, as noted, I'm very much aware that there is a history
7   here of both mental health issues and substance abuse issues
8   which, in combination, no doubt, are very difficult to treat.
9           But not to oversimplify the matter, the complexity of
10  his issues at the end of the day a defendant has to really want
11  to recover, in my opinion, for that to happen, and in my
12  judgment Mr. Douglas does not appear to have that desire at
13  this time.
14          Defendant Mr. Douglas states he became aware of mental
15  health issues at around age 20.  He participated in some mental
16  health treatment with Dr. Robert Millman presumably between
17  2009 and 2010.  He has been taking Buspar which is an
18  antianxiety medicine which is Fluoxetine which is an
19  antidepressant as described by BOP medical staff.
20          Defense also argues, incidentally, that there is no
21  mental health drug program at Lewisburg available to the
22  defendant at this time, that is to say before the so-called
23  RDAP program, but I would remind the defense that Lewisburg is
24  the very facility that the defense asked me to send or
25  recommend that Mr. Douglas be housed.

SPA-15

1CL5douS                    Sentence-CORRECTED

 1          Further, defendant, as I say, has been totally
 2   reckless in his continued pursuit of drugs.  We all learned --
 3   I say I learned after the fact that Mr. Douglas had convinced
 4   one of his attorneys, an associate, Jennifer Ridha, R-I-D-H-A,
 5   at one of New York's leading and finest law firms, to smuggle
 6   contraband, 32.5 milligrams of Alprazolam -- I think that is
 7   Xanax -- apparently in her bra to him in the MCC.  The
 8   government and the defense, although in my view this was a
 9   serious matter, they agreed and decided that it was in the
10   public interest to dismiss the complaint against Ms. Ridha and
11   that happened as a result of a deferred prosecution agreement
12   and that was approved -- the case, incidentally, was taken to
13   the magistrate judge and he approved it on July 8, 2011.  That
14   case was never presented to me until it was over which
15   surprises me somewhat.
16          So, this caper with Ms. Ridha started, apparently,
17   just before Mr. Douglas' sentence in April 2010, and it does
18   not appear that although this was a most serious infraction
19   that it resulted in any Bureau of Prisons administrative action
20   against Mr. Douglas.  In fact, it is unclear whether he used
21   the drugs that Ms. Ridha smuggled to him or distributed some of
22   them to other prisoners.  This irresponsible and unlawful
23   conduct occurred apparently on four occasions in or about April
24   2010 and perhaps even on the eve of the sentencing.  There is
25   no record of Douglas having been cited or sanctioned, as I say,

SPA-16

1CL5douS                      Sentence-CORRECTED

1   by BOP for possessing the Xanax pills.  I am constrained to
2   say, sorry to say that this incident seems to me was swept
3   under the rug both by the government and the defense.
4           At his sentence further on April 20, 2011, the
5   government agreed that Mr. Douglas should be sentenced as a
6   cooperator and had earlier signed a cooperation agreement with
7   him enabling him to avoid a statutory 10-year minimum sentence.
8   Mr. Douglas has, it appears to me, violated his cooperation
9   agreement by committing, for example, further crimes.  And, I
10  don't think he ever really testified in court as a cooperator
11  although he agreed to do so in his cooperation agreement.
12  While he did cooperate allegedly by revealing to the government
13  who his suppliers were, he never, as I understand it, testified
14  against his suppliers pursuant to a cooperation agreement,
15  rather he testified against David Escalera who was convicted,
16  incidentally, pursuant to an immunity compulsion order
17  presumably on the advice of counsel because, presumably, of the
18  contraband caper with Ms. Ridha and his potential exposure to
19  criminal penalties without immunity and the government agreed
20  to that.
21          You may remember that I said at sentencing in April
22  2010, after evaluating all of the submissions of which there
23  were many and the presentence report and the factors under 18,
24  United States Code, Section 3553(a), and after giving
25  Mr. Douglas a five-year sentence followed by five years of

SPA-17

```
     1CL5douS                    Sentence-CORRECTED
 1   supervised release and recommending drug treatment in the RDAP
 2   program while in jail, that I thought that that was his last
 3   chance.  And if you look at the sentencing transcript back then
 4   on page 9 I think I said the following:  "I think this
 5   sentencing may well be the last chance to make it."  And
 6   defense counsel agreed and stated, "He knows he is not going to
 7   get another chance."  That's at the sentencing transcript at
 8   page 24.
 9            The probation department and the Court have
10   significant experience with drug addicts.  At the April 2010
11   sentencing I sought to combine incarceration and drug treatment
12   in an effort to help Mr. Douglas straighten himself out.
13   Sentencing, especially of addicts who also have mental health
14   issues, is more art than science and the outcome here, as is
15   often the case, is far from clear.  But I remind you what
16   probation said in the sentencing in April 2010 which is equally
17   true today.  Douglas -- this is a quote from the old
18   presentence report and, incidentally, I'm incorporating by
19   references the submissions and the sentencing from April 2010
20   in its entirety since I am referring to it so much today.
21            The probation department said at that time Douglas'
22   familial personal and substance abuse issues do not mitigate
23   his culpability in as much innumerable defendants can provide
24   like accounts of familial discord, parental absenteeism,
25   substance abuse and worse.  The defendant has been afforded
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SPA-18

1CL5douS                    Sentence-CORRECTED

1   numerous opportunities at treatment to resolve his issues but
2   has chosen not to take advantage of them.  That is found at the
3   sentencing transcript at page 11.
4           And I have to add that I don't believe that I have had
5   another case ever where a defendant -- and many of the cases
6   that I have had both here and in Family Court involve addicts
7   who have difficulty with sobriety and also have serious mental
8   health issues -- I don't believe I have ever encountered a
9   defendant who has so recklessly and wantonly and flagrantly and
10  criminally acted in as destructive and a manipulative a fashion
11  as Cameron Douglas has and that includes self-destructive
12  behavior.
13          As I see it, Mr. Douglas has rejected the
14  opportunities afforded in his April 20, 2011 sentence, not to
15  oversimplify, seems to have blown the biggest opportunity of
16  his life.  In addition to the above incidents, Mr. Douglas'
17  adjustment to incarceration does not appear to be good in other
18  respects as well so the presentence report covers these issues
19  including ones that we have already gone over that he obtained
20  Suboxone from an inmate in Lewisburg, he has been using it in
21  small increments, he admitted while at the MCC in October of
22  2011 he obtained and used heroin on one occasion, that we have
23  been over, but the report also says that on November 4, 2011,
24  Douglas was cited for refusing to obey an order and for being
25  unsanitary and untidy, he was sanctioned 45 days loss of
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

SPA-19

19

1CL5douS                    Sentence-CORRECTED
1   commissary privileges for each violation.  On October 17, 2010,
2   Douglas was cited for possessing an unauthorized item for which
3   he was sanctioned 90 days loss of commissary privileges.
4   Douglas was absent from an assignment on July 26, 2010 and was
5   sanctioned 30 days loss of commissary privileges and 60 days'
6   loss of visiting privileges.  Then it also says Douglas was
7   absent from an assignment on March 25, 2011, was sanctioned 90
8   days' loss of commissary privilege.
9           So, incidentally, I could go on.  There is more in
10  those reports but in summary what I am trying to say is that I
11  believe it is facile and very much unpersuasive to say, as
12  defense counsel has in its submissions here and we are going to
13  hear from defense counsel shortly, that Mr. Douglas has been
14  punished enough.
15          I am fully aware that the Bureau of Prisons has, since
16  the April 2010 sentence, imposed sanctions against Mr. Douglas,
17  some of them severe for prison violations including the use of
18  drugs and possession of drugs and including 11 months in
19  disciplinary segregation as well as loss of visiting privileges
20  including family visits and also loss of good time credit, and
21  I factored in those sanctions in my analysis of the 3553(a)
22  factors as I think I should do and I certainly have done it in
23  trying to devise a sentence that is reasonable, fair, and
24  appropriate.  I am fully aware and have considered those
25  sanctions already imposed and in place by the Bureau of Prisons

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SPA-20

1CL5douS                    Sentence-CORRECTED
1   and my sentence will incorporate those sanctions and in fact
2   would be greater if they had not been imposed by the BOP.
3           I'm not sure who heard me when I said at the April
4   2010 sentencing but I'm going to repeat it, you remember that I
5   said in doing this I was responding to the numerous letter
6   submissions that I had gotten from the Douglas family from
7   celebrities, from friends, they -- and I was referring at that
8   time to the letters -- failed to mention, as do frankly the
9   submission of counsel fails to mention the inevitable negative
10  impact on society quite apart from any impact on Douglas'
11  family and friends and Douglas himself.  Now, I said that in
12  the context of dealing serious drugs.  This is a different
13  context today, a different violation, but the point is equally
14  applicable, it seems to me.  And the impact now, as I have been
15  trying to explain this morning, has included Ms. Ridha, the
16  Lewisburg facility, the MCC, other inmates and prison
17  officials.
18          The defense argues that I not impose any penalty or if
19  I do only a minor one and that, in my judgment, would not help
20  Cameron Douglas' recovery and it would be totally unfair and
21  inappropriate vis-a-vis other defendants who have equal or
22  greater drug and mental health issues.  I could go on but I
23  will move to the presentence report; it is dated December 13,
24  2011, there is an addendum of the same date.  I will mention
25  the correspondence I received from Mr. De Feis dated December

SPA-21

21

1CL5douS                    Sentence-CORRECTED
1   7, 2011, December 16, 2011, and from the government, of the
2   letter also from Cameron Douglas dated December 4, 2011.  One
3   of Mr. De Feis' submissions had letters attached to it from
4   Dr. Weiss and from Cameron Douglas' parents among other --
5   there were two letters from Dr. Weiss, one from a prison
6   expert, and a letter from Kelly Sott as well.
7             The Douglas letter dated 12/4/11 from Cameron Douglas
8   and submissions from the government dated 12/14 and 12/15, I
9   don't think I missed anything.  If I have, counsel will let me
10  know.  So, I would ask first, Mr. De Feis, whether you and
11  Mr. Douglas have had an opportunity to read and discuss the
12  presentence report, the addendum and the sentencing
13  recommendation.
14            Have you in fact read it and discussed it?
15            MR. De FEIS:  Yes, we have, your Honor.
16            THE COURT:  Mr. Douglas, you have been over those
17  materials with your attorney?
18            THE DEFENDANT:  Yes, your Honor.
19            THE COURT:  And do either of you have any objections
20  to the contents of the presentence report?
21            MR. De FEIS:  We just have a correction at paragraph
22  8, your Honor, which I indicate to the government it states
23  that the note that he lost 50 days of good time and he actually
24  lost 80 days.
25            THE COURT:  I'm sorry.  How much?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

SPA-22

22

1CL5douS                    Sentence-CORRECTED

1         MR. De FEIS:  Paragraph 8 of the presentence report,
2    your Honor.
3         THE COURT:  And it should be 80 instead of 50.
4         MR. De FEIS:  It should be 80 if you calculate it just
5    by looking at the attachments to our sentencing memo, your
6    Honor.
7         THE COURT:  Okay.  Anything else?  And, Mr. Douglas,
8    did you have any other objections?
9         THE DEFENDANT:  No, your Honor.
10        THE COURT:  How about the government?
11        MR. ANDERSON:  No objections, Judge.
12        THE COURT:  So, I'm going to return the presentence
13   report to probation, that's what we usually do, and for the
14   rest of the proceeding or for the next part of the proceeding I
15   will turn to defense counsel and then I will also hear from
16   Mr. Douglas, if he wishes to be heard, and then from the
17   government, and then I will preview the sentence and then I
18   will impose the sentence.
19        MR. De FEIS:  Thank you, your Honor.
20        THE COURT:  You bet.
21        MR. De FEIS:  I certainly never imagined that we would
22   be here again on a second sentencing.  It is very unusual in my
23   practice and certainly unusual in the history of the Court.
24        It is obvious that the Court has read everything and
25   with great care, just like it did last time.  I will try

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1CL5douS                          Sentence-CORRECTED
1    address a few of the highlights.
2                It is once again my task to try to present Mr. Douglas
3    in a good light, as someone who deserves the Court's mercy.  We
4    fully recognize that this task has become much more difficult
5    due, in large part, to the defendant's own conduct, even his
6    own conduct since the last time he was sentenced.
7                I will argue here as I did in my papers that a long
8    sentence, a sentence that will take him further away from the
9    treatment that he was about to get into, is not necessary to
10   punish, to deter or to promote respect for the law.  We
11   requested Lewisburg at the time because he wasn't going to be
12   eligible for any kind of drug treatment until the very end of
13   his sentence as indicated on papers.  Lewisburg is close enough
14   to his family and had a good RDAP program when he was eligible.
15   There was really nothing else that was available; it seemed
16   like it was the best place for him at the time.
17               This infraction has already cost him dearly, as the
18   Court knows.  It has cost him at least an additional year.  He
19   has lost 80 days of good time and he is in disciplinary
20   segregation under a very, very difficult situation.  That
21   disciplinary segregation is going to prevent him from getting
22   into a drug program, it is going to follow him to whatever
23   institution he goes into so if you do the math, if you add the
24   time that he lost in good time, the 11 months of disciplinary
25   segregation, it will follow him elsewhere.  It has already cost

1CL5douS                    Sentence-CORRECTED

1    him at least a year.
2          The Court was very careful in fashioning the last
3    sentence and made similarly careful remarks before imposing the
4    sentence.  If I may, I know the Court already looked at the
5    transcript of the prior proceeding but as the Court said at
6    page 12, the current literature is to the effect that treatment
7    is one of the most important components of sentencing drug
8    addicts and the Court cited a couple of studies from the
9    National Institute on Drug Abuse.  Research has demonstrated
10   that treatment for drug addicted offenders during and after
11   incarceration can have a significant effect on future drug use,
12   criminal behavior and social functioning.  The case for
13   integrating drug addiction, treatment approaches with the
14   criminal justice system, is compelling.  And the Court at that
15   time did fashion a sentence and recommendations that would get
16   him into a treatment program and supervised release terms that
17   would last until the almost indefinite future because they
18   could be extended.
19         Even if we work with the guidelines figures that the
20   government and the defense have agreed to -- and I understand
21   the Court has already expressed its inclinations here so in
22   some ways I recognize that it is a difficult road that I am on,
23   and he got an 18-month sentence at the low end of the range
24   that the defense agreed to, it would be another 15 months
25   before he got into a treatment program.  If he got the high

SPA-25

1CL5douS                        Sentence-CORRECTED

1   end, a 24 month sentence, it would be another 21 months before
2   he could get into a treatment program at the facility.  And we
3   recognize that these treatment programs are not perfect, they
4   don't address, as you know, co-morbidity.  He is going to need
5   a lot of aftercare.  We recognize all of that but at least it
6   is something.  I mean to think that we were going to have
7   perfect behavior or even acceptable behavior with long periods
8   of time almost belies the literature of drug addiction.  He did
9   go through a long period of sobriety before he was sentenced.
10  There was certainly some slippage along the way.  He passed all
11  of his urinalysis except the last one.  He did make progress
12  but we would be frankly flying in the face of the history of
13  addiction to expect that he was going to stay on the straight
14  and narrow throughout his time in without any treatment
15  whatsoever.  I would have liked that to be the case but
16  unfortunately history suggests otherwise.
17          I do want to put this in perspective -- and frankly
18  the surest way to guarantee that he is not going to be able to
19  reform himself is to say it is out of his control.  It is, to
20  some extent, within his control we recognize that.  He did make
21  very bad decisions here for which he accepts full
22  responsibility but on the other hand I am dealing with -- we
23  are dealing with a very damaged individual, damaged in ways
24  through his use of heroin and just about every other drug as
25  the judge recited, and also damaged psychiatrically as

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SPA-26

1CL5douS                          Sentence-CORRECTED

 1    indicated in the literature.
 2            I do want to put this in perspective again.  He made
 3    some bad decisions for which he accepts complete responsibility
 4    which I think impressed the government in deciding not to seek
 5    to deny him acceptance of responsibility credit.  I know the
 6    Court has indicated its inclination and even its decision, but
 7    if I may, we were on the eve of a trial, frankly at the time,
 8    he was being prepped for disclosures to be made to the defense
 9    about exactly what happened and he was initially confronted
10    with something that turned out not to be true which was that it
11    was cocaine and he knew it wasn't cocaine.  He was frankly
12    ashamed, embarrassed, and I think recognized it even in the
13    last submission that we made that he doesn't want to keep this
14    up any longer.  But it was really -- to the extent courts have
15    applied obstruction of justice and we are not fighting the
16    obstruction of justice, you usually have examples of much more
17    egregious obstruction and we cite a few, I don't know whether
18    it will be helpful, but the bottom line is he fully admitted
19    his own culpability here and went into court almost immediately
20    to take his plea which I think impressed the government and
21    that is why I think they took a restrained approach about
22    giving Cameron the benefit of the doubt.
23            THE COURT:  You know all of these expressions like
24    benefit of the doubt, they're not part of the law.  And I think
25    that the government just got it dead wrong about acceptance of

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

1CL5douS                    Sentence-CORRECTED
1  responsibility for the reasons I said.  There may be
2  extraordinary cases where you can have acceptance and
3  obstruction, this is certainly not an extraordinary case in
4  that regard, and I think that the line doesn't even entitle him
5  to be considered for acceptance so --
6           MR. De FEIS:  I understand.  All I am trying -- if you
7  apply --
8           THE COURT:  No, I understand, but what is really
9  important is not to get warm and fuzzy.  The rule there is
10 pretty clear and whether you like someone or want to help
11 someone, etc., that's not part of that rule.  So, the
12 acceptance of responsibility doesn't say you are more inclined
13 to give more lenient or less than lenient treatment.  It is, as
14 I described it, a legal matter and as a legal matter, to me
15 anyway, you know, respectfully, you can certainly disagree and
16 so can the government but I don't think he qualifies under the
17 rule.
18           MR. De FEIS:  I understand, and the Court has ruled.
19           Again, what I am saying is that the circumstances were
20 quite extraordinary here in view of when the obstruction
21 occurred and in what context and who he was being interviewed
22 by and that's all and the confusion, frankly, and I think the
23 government took that into account.  In fact, we didn't get any
24 disclosures from the government about the issue, we went in to
25 plea almost immediately.  So, I think that they are in a good

**SPA-28**

1CL5douS                    Sentence-CORRECTED

1  position to determine whether he has accepted responsibility
2  and, you know, I think the defendant has reached out to the
3  Court as well about his submission about how fully he throws
4  himself on the Court's mercy here and the one case that we both
5  rely on indicates that not contesting the obstruction,
6  essentially agreeing to it, is an instance of an extraordinary
7  circumstance.
8          So, that's one of the reasons that we were not
9  requesting a hearing, because basically we do want to rely on
10 the benefit the cases cite in an instance where you can have
11 both obstruction and acceptance of responsibility.  We have
12 accepted responsibility for the obstruction conduct, your
13 Honor, and I think the government agrees.  The Court has
14 already made its determination.  I will move on.
15         I do want to put this in perspective, as I said.  He
16 decided to cooperate, as the Court knows, as soon as he was
17 arrested and could cooperate fully.  It was a courageous
18 decision.  It was a decision he made without even having a
19 lawyer at the time.  He indicated to the DEA when he was
20 arrested that he was willing to cooperate.  He knew the risk
21 that his decision would be publicly revealed as it was and
22 would follow him for the rest of his life.  The interesting
23 thing, your Honor, is that, again, to put even the obstruction
24 in context is that he was fully truthful about his own
25 involvement in drug dealing even before --

29

1CL5douS                    Sentence-CORRECTED
1           THE COURT:  In the April -- at the April 2010
2    sentencing you are talking about?  Or now.
3           MR. De FEIS:  I'm saying in August of 2009, late July
4    of 2009, he was completely truthful about his own involvement
5    in drug dealing.  Before there was any realistic possibility to
6    have to testify against anyone I think for a long period of
7    time there was a belief that no one would be arrested and, in
8    fact, I think that's one of the reasons the government agreed
9    to accelerate his sentence, because no one was in jail, and I
10   think it was believed that suspects had fled the country and
11   they gave him credit and the Court to its credit and to which
12   we are thankful, agreed to accelerate his sentencing in order
13   to get him into a program because there was no trial.  But the
14   basic outlines of his story were regarding his own drug
15   dealing, as opposed to his usage was the same.  And he
16   revealed, again, within hours of his arrest, certainly the next
17   day when I had an opportunity, his complete involvement in the
18   conspiracy involving David and Eduardo Escalera and to take it
19   a step further, he also revealed his involvement in cocaine
20   deals, multi-kilo quantities of cocaine that I don't believe
21   the government knew anything about.  I don't think anything
22   developed from it but this would have been at his own peril in
23   terms of the exposure that he faced in sentencing and it would
24   have potentially involved additional cooperation.  And he came
25   forward and admitted that.  He agreed to work undercover

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

30

1CL5douS                    Sentence-CORRECTED

1  although it only lasted a brief time, it lasted until the news
2  broke that he had been arrested.
3          His statements were now fully tested at a trial and,
4  frankly, he was very close, as the Court knows, to David and
5  Eduardo Escalera.  They knew every aspect of his life.  I'm
6  sure they fully armed his lawyer with everything that could be
7  asked of Cameron on cross-examination.  Really nothing new
8  developed regarding Cameron's drug dealing.  He came through as
9  a witness and, your Honor, again, I don't think the government
10 would disagree that Cameron testified both pursuant to his
11 cooperation agreement and the immunity, it wasn't as if he
12 refused to testify.  He was going to testify.  It was a
13 decision made by the government and the defense as to what to
14 do with the Ridha misconduct recognizing that she had not been
15 prosecuted at all, what was fair and appropriate.  So, he was
16 there -- it wasn't as if he wasn't going to testify absent
17 immunity.  He was there to testify and would have testified
18 fully and, frankly, I think they would have given him the same
19 coverage they gave Ridha.  If anything she deserves, in my
20 opinion, much more blame for this.  I realize that he asked her
21 to do it but the reason you have lawyers is to prevent things
22 like that from happening and that's it.  It wouldn't have
23 happened with me and it wouldn't have happened with, frankly,
24 any lawyer that could stand up here and practice before your
25 Honor, okay.  And in terms of what he told her to do, she

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

1CL5douS                    Sentence-CORRECTED

1  should have said no.  That's why you have lawyers.  She should
2  have said, no, I can't put that on a form.  Again, he accepted
3  responsibility.  He may have accepted more responsibility than
4  he deserves for what she did.
5         But, in any event, he came through as a witness
6  pursuant to the cooperation agreement.  He expected no further
7  consideration.  He was transported into this district twice,
8  two separate circumstances.  He was put in special housing at
9  times.  He even found himself, your Honor, as you will recall,
10 in the same cell with the people he was going to testify
11 against for 45 minutes.  Imagine how stressful that was, your
12 Honor, despite the separation order.
13        Again, I'm not here to suggest that he's the victim.
14 He recognizes he is here because it is his own conduct that
15 brings him here, but I wouldn't be doing my job if I didn't try
16 to put what he did in perspective.  He was on the money, your
17 Honor, about, I believe, the very, very important things which
18 was his drug dealing and I think his cooperation led to the
19 arrest and conviction of David that lead to further conviction
20 in the case.
21        Kelly Sott, who is actually here today, is going to
22 testify at the next proceeding, and she wrote a letter to the
23 Court.  Again, I will be brief, and the Court was very
24 indulgent last time by letting me recite some of the letters, I
25 only have a few to discuss here.  She talked about what it is

                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

1CL5douS                    Sentence-CORRECTED
 1   like being a witness and she begins by saying:  Jail is
 2   obviously not curative of his addiction.  If anything, it does
 3   nothing but add to his anxiety as he has told me many times.
 4   She goes on to say:  Cameron has been under the spotlight of
 5   the media ever since his arrest making it next to impossible to
 6   remain anonymous.  I can only imagine how uncomfortable and
 7   difficult it must have been to be relocated back to the MCC or
 8   to any new prison where every inmate and staff member has
 9   preconceived judgments as to his character and intentions.
10           By the way, the last time the trial did take place, it
11   was over Christmas that he was transported and it wasn't like
12   he was brought back here.  He sat in a transfer facility for a
13   month and when he got back here he was put in special housing
14   because there is a policy because something happened to him
15   repeated, Kelly goes on, he was uprooted from the campus
16   facility where he was designated on two separate occasions and
17   for months at a time and was placed in an almost unbearable
18   situation in order to testify as a trial witness.  I can
19   understand having not been treated for his heroin addiction as
20   of yet the urges to return to a drug which used to give him
21   some comfort and relief with his anxiety.
22           His cooperation, his time in jail, his adjustment have
23   been marred by his persistent drug use and his need to
24   self-medicate.  That's it.  And he lies about things that many
25   addicts lie about.  And many alcoholics lie about.  Have you
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

33

1CL5douS                    Sentence-CORRECTED

1   been drinking?  No.  I haven't had a drop.  And that is a very
2   shameful, embarrassing fact of his life that he has never been
3   able to get this under control and that's the only way I can
4   figure it out in my own mind.  Even my own mind about why he
5   would tell the truth this time around when he was confronted
6   about Suboxone, and the government isn't going to dispute they
7   have been able to corroborate that and I think that goes to
8   some mitigation, he was able to tell the truth about Suboxone
9   but not all of the details about how he obtained the heroin.
10          THE COURT:  Well, that's putting a pretty generous
11  spin on how he lied about how he --
12          MR. De FEIS:  I understand, but why tell --
13          THE COURT:  I mean, you have to call it as it is,
14  right?
15          MR. De FEIS:  I think it is part of the pathology.
16          THE COURT:  Well, okay.
17          MR. De FEIS:  It also occurs to me why does he tell
18  the truth about his drug dealing?  Suboxone is a withdrawal
19  drug.  We are past that, we are not arguing the obstruction.
20          THE COURT:  Right.
21          MR. De FEIS:  But I'm just focusing on what is going
22  on in this man's head when he can come in and say I did these
23  deals, we collected the money, the government going after the
24  fact with all the Fed Ex records demonstrating all of this,
25  talks about his bank deposits and can't talk about taking

1CL5douS                    Sentence-CORRECTED

1   drugs, his drug addiction.  And that's it.  I mean, it is not
2   that stunning.
3           I spent some time speaking to Carol Weiss whose
4   letters the Court has read about how this could happen and, I
5   mean, what she said to me is that it is not that -- it is
6   almost common sense that he is not even in a position because
7   of his drug addiction to be tested for antisocial personality
8   disorder and no one -- she says I can't even say this is
9   fundamentally amoral.  He is so -- to use the colloquial --
10  screwed up some things make sense, some things don't make
11  sense.
12          But, in any event, I struggle with this.  I knew that
13  this would be a focus of the sentencing and rightfully so, but
14  again it is not -- I am attempting to portray him in a fair
15  light for the Court.  I wouldn't say that I am being overly
16  generous.  I think he has fully accepted responsibility and it
17  hurt him a lot to hear because the government has been fair to
18  him and was fair in showing restraint.  And when I went to see
19  him on Friday when I went there with the government's letter
20  and said this is what they're saying about you, he said let's
21  just drop it.  It's done.  He gets it.  It takes longer for him
22  to get it but he does get it.
23          So, you know, as I said, his cooperation, his life
24  have been marred by his drug addiction which he has never been
25  able to kick and that is certainly why he is here again.  But

SPA-35

35

1CL5douS                    Sentence-CORRECTED
1  before there were drugs and beneath the drugs there is a good
2  person.  Some of his friends from every walk of life who he has
3  had a positive impact on a lot of people, has a lot to live for
4  and has squandered it.  Those are his own words.  I think he
5  testified to that, he said it at the last trial.  He gets it,
6  he recognizes it now.
7          I think the Court gave me an opportunity the last time
8  to talk about letters that friends and family, etc., submitted.
9  The Court characterized him at that time as talented, caring
10 and big-hearted, and that's really what he is.  He's got a
11 great sense of humor.  He really does.  And a lot to live for,
12 but he remains an addict at bottom who has not received any
13 treatment and some of it is through fault of his own in the
14 past but some of it, particularly today, is through no fault of
15 his own.  It is just the way the system works.
16         He was arrested in August of 2009.  He spent eight
17 months before he was sentenced.  He received some treatment
18 from Dr. Millman.  I wouldn't say -- regular visits at least
19 two, three times a month, I would say, for an hour.  What can
20 be accomplished?  From the time he was sentenced in April of
21 2010 to today 20 months have passed in which he has received no
22 treatment whatsoever.
23         His addiction, as Dr. Millman told us, was severe
24 compared to others in terms of the quantity of drugs, the type
25 of drugs and the length of time in which he was addicted and,
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

SPA-36

1CL5douS                    Sentence-CORRECTED

1  as Millman said, everything in his life was given up to pursue
2  and use drugs.  And, as Millman told us, almost -- almost
3  prophetically -- and again, I don't mean to suggest that
4  Cameron did not have free will here, okay, but almost
5  prophetically said he feared that as Cameron was about to get
6  sentenced that any delay in getting treatment would undo the
7  progress that had been made and he feared any scenario where
8  Cameron is left untreated and surrounded by temptation.
9           THE COURT:  He also suggested that he be --
10 Mr. Douglas be out on bail and go see Dr. Millman a couple of
11 times a week in New York City.  He thought that was a good --
12          MR. De FEIS:  -- idea even.
13          THE COURT:  Just let me finish.
14          MR. De FEIS:  Yes.  Please.  Sorry.
15          THE COURT:  I thought it was very ill-conceived and so
16 that's why I remanded him at the time.  I couldn't imagine, by
17 any stretch of the imagination, however talented Dr. Millman is
18 how that could possibly have worked.
19          But, that was then, this is now.  That was a long time
20 ago.  We had the bail hearing a long time ago, this is now.
21          MR. De FEIS:  I will go back, but we are talking about
22 inpatient facilities as well with Dr. Millman, inpatient
23 residential facilities.  And, frankly, other defendants in this
24 case were afforded that opportunity.  We cite them in the
25 conclusion of our sentencing memo.  He was not given the

SPA-37

1CL5douS                    Sentence-CORRECTED

1  opportunity to have inpatient residential treatment.  And I
2  don't disagree, I'm not here to argue the decision that was
3  already made, okay?  And I think the Court had some concern
4  about whether the family was the cause of the problem or could
5  be a cure for the problem.  I think that was part of it as
6  well, about what would happen when he got out.
7              But past is past, as we agree.  What we can agree is
8  that he has gotten no treatment in 20 months and that any
9  additional sentence -- any additional sentence -- beyond what
10 the Bureau of Prisons has recommended is going to take him
11 further back.
12             THE COURT:  I think at the time, if I remember, not to
13 belabor the point, but you, in court, as much as thanked me as
14 well on behalf of Mr. Douglas for remanding him in hindsight,
15 and you indicated that that was his longest period of sobriety
16 in his life.  So you, I think, confirmed that that was the
17 appropriate sentence.
18             In any event that was then, this is now.
19             MR. De FEIS:  He already surrendered -- he voluntarily
20 consented to remand in August of 2009.  He was already in jail.
21             THE COURT:  Counsel, we had a bail hearing at which
22 Dr. Millman testified and you did too asking that he be
23 released --
24             MR. De FEIS:  Right.
25             THE COURT:  -- to his mother's home by me and to be
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

SPA-38

                                                              38
1CL5douS                    Sentence-CORRECTED
 1    able to be treated by Dr. Millman on an outpatient basis and I
 2    denied that application as ill-conceived.  That's what the
 3    record shows in this case.
 4               MR. De FEIS:  Okay.
 5               THE COURT:  Do you disagree that that happened?
 6               MR. De FEIS:  I think I know Dr. Millman did testify.
 7    What I don't recall without looking at the testimony is exactly
 8    what types of treatment we were proposing at the time.  That's
 9    what I don't -- I don't recall and certainly we have more than
10    open --
11               THE COURT:  The transcript will speak for itself.
12               MR. De FEIS:  Whatever.  We are past that.
13               THE COURT:  Right.
14               MR. De FEIS:  The point I wish to make is that he has
15    received no treatment and, as Dr. Weiss said, this is a person
16    who has used drugs for so long that he has permanently damaged
17    his metabolism.  He suffers from something, as you can see in
18    her report, as protracted abstinence syndrome which she says
19    even drug-free long-term users are biologically opioid
20    deficient for many years after detoxification in the same way
21    an individual with an underactive thyroid gland is thyroid
22    deficient without external thyroid hormone.  Mr. Douglas, who
23    has been opioid dependent for over seven years is a classic
24    example of a long-term user who has damaged his body's ability
25    to produce natural opioids.  The powerful biological drive to
                        SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300

1CL5douS                    Sentence-CORRECTED
1  correct this chemical deficiency can last for many years after
2  detoxification leading to a higher risk of relapse and is the
3  rationale behind the practice of opioid maintenance with
4  methadone or Suboxone.
5          He doesn't have the ability to react to pain or
6  stress.  These two years have been incredibly stressful, in the
7  way someone who hasn't been opioid dependent for so many years
8  can.  The biological drive to correct this deficiency is as
9  strong as the drive of a hypoglycemic diabetic person reaching
10 for orange juice.  Sometimes the opioid deficiency is
11 permanent, sometimes it is corrected slowly over the years,
12 however during those years the expected symptoms of anxiety,
13 malaise, depression and craving can easily thwart efforts at
14 abstinence and recovery.
15         Your Honor, a long sentence, one that will only take
16 him further away from comprehensive treatment which he is not
17 going to get in the RDAP but at least he will get in the
18 prison, some kind of treatment is not necessary to punish,
19 deter or promote respect for the law.  This conduct, again, is
20 very different from the conduct that was previously before the
21 Court.  This conduct involves user quantity of drugs, less than
22 an eighth of a pill of Suboxone and some indetectable amount of
23 heroin, as the Court knows.  It is usually handled by the
24 Bureau of Prisons, usually those administrative proceedings are
25 enough and, as we argue in our papers, it is rare that there
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

SPA-40

40

1CL5douS                     Sentence-CORRECTED
1   are prosecutions.  Frankly, again, it is not -- the laws are on
2   the books for a reason.  We could consider whether we would
3   have this prosecution if he wasn't about to testify as a
4   witness.
5           THE COURT:  I'm sorry?
6           MR. De FEIS:  We question whether he would have been
7   prosecuted for this beyond what the Bureau of Prisons already
8   did to him if he wasn't about to testify as a witness in a
9   case.  Recognizing, again, that it did not involve drug
10  dealing, it involved a small amount of a withdrawal drug and a
11  small amount of suspected heroin.
12          THE COURT:  I'm not sure I'm understanding you.  He is
13  not going to testify against Escalera.
14          MR. De FEIS:  But they anticipated that he was going
15  to testify at the time.
16          THE COURT:  Right, but he is not going to.
17          MR. De FEIS:  He is not now.
18          THE COURT:  Yes.
19          MR. De FEIS:  But he has already pleaded guilty, your
20  Honor.
21          THE COURT:  I get it.
22          MR. De FEIS:  That's all I'm saying, is that --
23          THE COURT:  His cooperation agreement would require
24  that he testify if the government asked him to, right?
25          MR. De FEIS:  He is ready, willing, and able to
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

SPA-41

1CL5douS                 Sentence-CORRECTED

1   testify if the government decides to use him, as I'm sure
2   Mr. Anderson will support.
3           He was punished in two separate proceedings at the
4   Bureau of Prisons.  They charged him separately for a dirty
5   urinalysis and punished him again for possessing drugs.  It is
6   extraordinary.  As the prison consultant said, these kinds of
7   sanctions are only imposed in the most severe cases and he
8   wonders whether Mr. Douglas was singled out for his notoriety.
9           He goes through a number of instances in his 30 years
10  of practice where sanctions were less severe for conduct that
11  obviously is much more harmful than the conduct --
12           THE COURT:  You are talking about Mr. Sickler --
13           MR. De FEIS:  Yes, I am, your Honor.
14           THE COURT:  -- who submitted an affidavit attached to
15  your sentencing submission?
16           MR. De FEIS:  That's correct.
17           He lost good time, 80 days worth of good time.  He is
18  now in disciplinary segregation which won't change when he gets
19  through his next institution, it is 23-hour lockdown.  Perhaps
20  most devastating at all is that he's been denied family visits
21  in consecutive proceedings brought by the Bureau of Prisons.
22  He is not going to have family visits for two years.
23           THE COURT:  Yes.  I must say in that respect I do
24  agree with Dr. Weiss, it is not clear to me why that is
25  appropriate.  In fact, I think it is not appropriate and I'm

SPA-42

1CL5douS                    Sentence-CORRECTED

1   going to recommend, in my sentence, that family visits be
2   resumed.  Everybody is generally of the view that family visits
3   are important to any prisoner and especially an addict but I
4   can't change the Bureau of Prisons.  I gather you are appealing
5   that decision but that is one aspect of their sanctions that I
6   fail to understand how that is helpful.
7           MR. De FEIS:  I thank you so much for that on behalf
8   of his family.  We were going to request that recommendation
9   and I think it can have an impact on the Bureau of Prisons.
10  Thank you so much for even volunteering it before I got to
11  that.
12          He will have no social visits and he is going to have
13  a disciplinary transfer where he is going to be in a higher
14  security facility outside the northeast.  We have
15  recommendations which I would request at the conclusion of the
16  proceeding.
17          Sickler describes this punishment as Draconian and
18  without precedent and I think he is accurate.  Probation, in
19  its report, its thorough report as usual, in view of these
20  sanctions recommends -- they actually say:  Considering the
21  severe sanction, a sentence at the low end of the guidelines is
22  sufficient to deter his conduct and promote respect for the
23  law.  So, I credit probation for considering that in its
24  recommendation and, as the Court knows, pursuant to the Court's
25  practice, probation was only going to recommend sentence within

                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

SPA-43

1CL5douS                    Sentence-CORRECTED

1  the guidelines.
2         Any further delay in his treatment, your Honor, I
3  submit, will serve no good law enforcement purpose and continue
4  him at risk.  The tragedy, as you know of being segregated --
5  repeatedly in our papers already -- is that he was about to get
6  into a prison drug program.  We know that this was only the
7  beginning, just the beginning, not an end, beginning to a very
8  long road, but it was important that he get started somewhere.
9  The Court imposed very strict terms of supervised release the
10 last time involving residential treatment if recommended by
11 probation, weekly therapy; individual, group and family
12 sessions on a very, very regular basis, AA or some kind of
13 12-step program, regular testing and status conferences before
14 the Court which, frankly, doesn't appear in the light of
15 sentences of addicted offenders.  He knows he is going to be
16 before the Court on many, many occasions in the future and he
17 is going to be regularly tested as he was in jail and, again, I
18 recognize there are only so many times that I could say give us
19 one more chance.  I recognize that.  But, with all due respect,
20 I don't think he has been given a full opportunity to clean
21 himself up in jail and to be rehabilitated.  There would be no
22 need for program, frankly, if he had already been cured.  He is
23 obviously not --
24         THE COURT:  You and I have a respectful disagreement
25 about whether he has been given adequate opportunity and

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SPA-44

1CL5douS                    Sentence-CORRECTED

1   chances.
2              MR. De FEIS:  I understand.
3              Your Honor, he has a strong sense of when he heard the
4   prior sentence and saw you preside at the trial that you did
5   have care for his well being and he wanted to write the Court
6   directly, which he did and, again, I will be brief, but he says
7   as well I disappointed you, your Honor, and the Court.  I
8   realize that we do not know one another personally, however I
9   sense you truly have my best interests at heart and I feel from
10  you a genuine concern and effort in guiding me to a position
11  where I will have the best opportunity for success and for life
12  as a contributing member of society.  This exertion on your
13  behalf is more than fair and for that I am truly grateful.
14             Your Honor, as we indicate in our papers, it is not
15  uncommon or cause for alarm that there is a relapse here.
16  There is a great quote in the Meyer opinion, Second Circuit
17  opinion, from a therapist report which discusses that such
18  occurrences are the rule during recovery rather than the
19  exception and should not be cause for undue alarm.  Recovery
20  actually represents an attempt to militate against one's life
21  history and psychological development; that the recovering
22  addict might momentarily relapse is not only easy to appreciate
23  but equally witness to the initial fragility of the process.  I
24  said that I was surprised and certainly I didn't want to be
25  here again addressing you at a sentence.  The fact that I am

SPA-45

1CL5douS                    Sentence-CORRECTED
1   here now at this point it would certainly not be surprise to
2   any specialist in the field, in fact it may have been a
3   surprise if he was able to maintain his sobriety without
4   further support.
5           I certainly hope that I'm not here again defending
6   drug use.  I know I will never be here again defending him as a
7   drug dealer.  He's made some ambitious promises to the Court in
8   his letter.  He says:  I promise you, your Honor, if you see
9   fit, to grant me the opportunity to build myself and gain the
10  tools I need to shape my future accordingly.  I will not
11  disappoint, nor will I ever stand before you in a negative
12  light again.
13          Your Honor, I just hope that he gets a fair chance to
14  keep that promise, so I urge the Court to consider a sentence
15  that gets him into rehabilitation, Bureau of Prisons program,
16  strict terms of supervised release as soon as possible.
17          Thank you very much.  I have recommendations.  I don't
18  know whether the Court wants to propose recommendations now or
19  at the conclusion.
20          THE COURT:  You can do them now.  As to facility --
21          MR. De FEIS:  Facility.
22          THE COURT:  Whoa, whoa.  I'm only going to recommend
23  that he be placed in a facility designated by the Bureau of
24  Prisons.  I'm not going to include another recommendation but
25  I'm going to attach to that recommendation that it be a
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

SPA-46

1CL5douS                    Sentence-CORRECTED

1   facility where they do treat for drug abuse and they also have
2   mental health programs but I'm not going to get more specific.
3   We did that the last time, Lewisburg.  It doesn't seem to have
4   worked out and I don't mean to think he is eligible for it, but
5   I'm not going to specifically make that recommendation.  I'm
6   going to recommend that he be designated, just so it is clear,
7   to a facility where they treat, from the get-go, drug abuse and
8   mental health issues.
9              MR. De FEIS:  All right.  We indicate in our papers
10  that a facility that has a particularly strict RDAP program is
11  Coleman low that we believe he would qualify for, it is 10
12  months.  I understand the Court has indicated it won't
13  recommend a facility but that would be the facility that we
14  would request if the Court would consider it.
15             THE COURT:  Sure.
16             MR. De FEIS:  And it is in the Sickler affidavit, that
17  as the Court have the same language previously used with
18  respect to his need for drug treatment.
19             THE COURT:  My plan is to include the terms and
20  conditions of supervised release in the terms and conditions of
21  supervised release in this judgment with three modifications;
22  one is that I'm going to recommend that his sentence be served,
23  as I just said, at a facility designated by the BOP which
24  offers drug and mental health treatment from the outset;
25  second, I'm going to also recommend, I think this happens
              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

SPA-47

47

1CL5douS                    Sentence-CORRECTED

1    anyway, but that at the outset he be given a physical and
2    medical exam and evaluation; and I'm also going to recommend to
3    BOP that it lift its restriction on immediate family visits.
4    Otherwise, the same terms and conditions of supervised release
5    as we did in April 2010 are incorporated, by reference, into
6    this sentence.
7              MR. De FEIS:  I guess the only further recommendation
8    is that I also request that the Court recommend that the Bureau
9    of Prisons reconsider the disciplinary segregation in view of
10   his need to receive treatment because he is not going to get
11   treatment while he is in disciplinary segregation.
12             THE COURT:  In that regard, I'm going to defer to the
13   Bureau of Prisons.  And I understand you appealed those
14   sentences anyway and that's something you all should take up.
15             MR. De FEIS:  We are.  The chances, as indicated of
16   prevailing on appeal --
17             THE COURT:  That's not something I feel comfortable
18   recommending.
19             MR. De FEIS:  Right.
20             Thank you very much, your Honor --
21             THE COURT:  You bet.
22             MR. De FEIS:  -- for your consideration.
23             THE COURT:  Mr. Douglas, do you want to be heard?
24             THE DEFENDANT:  Yes, your Honor.
25             Your Honor, I have been able to stay abstinentfrom
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

48

1CL5douS                    Sentence-CORRECTED

1   self-medicating for long periods of time as my record of new
2   ways will reflect.  Although, I must tell the Court that each
3   day that accomplishment is accompanied by great effort and
4   struggle.  See, your Honor, I cannot seem to find comfort
5   within my own skin.  My mind is constantly seeking relief from
6   itself that I have not been able to manifest.  It is also true,
7   your Honor, that I faltered in this battle that I have been
8   waging literally daily within myself when I was relocated to
9   the MCC and for this I feel ashamed, I feel defeated, and most
10  of all a deep regret and keen resentment directed toward the
11  power of this maleficent ability.
12          However, your Honor, having experienced the amount of
13  times I have been able to successfully overcome the drowning
14  weight of this burden in environments that are not conducive to
15  my plight, I have come to realize through these trials that I
16  do, without a doubt, possess the strength and the will and the
17  determination to follow through and to find success.
18          I feel so very confident, Judge Berman, that if I was
19  able to attain the proper medical treatment to amend this
20  chemical imbalance or whatever dysfunction my mind is driving
21  against on a routine, sometimes hourly basis, I know, your
22  Honor, I know that I bear in my heart what it will take to
23  overcome this plague once and for all.
24          There is nothing that I desire greater or will work
25  more diligently to realize for myself and for my loved ones

**SPA-49**

1CL5douS                    Sentence-CORRECTED
1   than to finally recognize the true capacity of my capabilities
2   untainted.
3           So I beseech of you, Judge Berman, to please grant me
4   the room to deal with the situation medically before you resort
5   to throwing the proverbial book at me.  As I have pledged to
6   you in my former letter, your Honor, if I should fall short I
7   will stand before you without judgment -- I mean without
8   defense, nor will I seek solace in your judgment.  But here
9   today I plead with you, Judge Berman, to grant me the
10  opportunity to treat this malignant affliction through the
11  medical attention that is available to us in this day and age
12  where doctors have discovered so much about the treatment of
13  this particular disease.
14          I am grateful, Judge Berman, for the opportunity you
15  have allowed me to address the Court.  Thank you, sir.
16          THE COURT:  You are welcome, very welcome.
17          Does the government wish to be heard?
18          MR. ANDERSON:  Yes, your Honor.  Very briefly.
19          I think the Court has fairly and accurately described
20  the facts leading up to today's sentencing and has carefully
21  reviewed the factors set forth in Title 18, United States Code,
22  Section 3553(a) and how they apply to the defendant.  The
23  government just emphasizes a few points which are explained in
24  greater detail in the letter that has already been submitted to
25  the Court, the first of which is that this is a serious
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

**SPA-50**

1CL5douS                    Sentence-CORRECTED
1    offense.  Notwithstanding defense counsel's questioning about
2    why this prosecution was brought or whether other defendants
3    are treated similarly, Congress, by statute, has determined
4    that the possession of narcotic drugs in prison is the most
5    serious type of contraband that an inmate can possess in prison
6    and has authorized a 20-year maximum for that offense.
7              With respect to the BOP, the risk to inmate safety and
8    the efficient functioning of the Bureau of Prisons is just
9    beyond dispute when contraband like drugs is introduced and,
10   according to BOP regulations, the possession of narcotics
11   ranges among the greatest severity level among the prohibited
12   acts that are listed in their regulations.  So, this is a
13   serious crime.
14             Equally serious, Judge, is that this is not the first
15   time the defendant has fallen short with respect to either
16   abiding by the rules set forth by probation and the Court or
17   the rules set forth by the Bureau of Prisons and you reviewed
18   that in your remarks earlier so I'm not going to go through
19   them again.  But, often when I addressed -- when the government
20   addresses the Court during sentencing recidivism, the question
21   of what the defendant has learned from previous sentences that
22   have been imposed in the past is one of the most important
23   considerations to take into account, is the message getting
24   through.  In this case the message was not getting through.
25             And finally, the obstruction.  The defendant did
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

1CL5douS                    Sentence-CORRECTED

1  promptly admit responsibility for possessing the drugs, he
2  didn't deny it, and I will address this in just a second but
3  that's why the government thinks he should have acceptance of
4  responsibility credit.  But he didn't have to then --
5          THE COURT:  Do you think prompt admission and you get
6  it?
7          MR. ANDERSON:  No, Judge.  I will address in more
8  detail in context of that question in just a moment.
9          THE COURT:  Okay.
10          MR. ANDERSON:  It is just the government respectfully
11  disagrees but understands the Court's position.  And I
12  certainly don't think it is required by law, I simply think it
13  is authorized by law.
14          THE COURT:  Right.
15          MR. ANDERSON:  It is within the Court's discretion to
16  decide whether it is appropriate.
17          I think he promptly admitted he had those drugs.  We
18  did have a bad field test that indicated it was cocaine instead
19  of heroin on the piece of paper.  Mr. Douglas told me, no, it
20  is not cocaine, it is heroin.  And that's what he admitted to
21  in court when he came in, he promptly accepted responsibility,
22  no discovery, no indictment, he waived all of that, and I think
23  that's to his credit.  The problem is that he wasn't candid
24  about where the drugs came from and that did hinder the
25  investigation.

```
                                                        52
1CL5douS                    Sentence-CORRECTED
1            THE COURT:  Well, he actually lied.
2            MR. ANDERSON:  Exactly.  He didn't tell us the truth
3    about how he came to possess the drugs, that came to light
4    through another source approximately a week or so later and we
5    made an arrest in connection with that information.
6            And so, that is not to his credit, the obstruction,
7    and that's why the government sought it but I do think it is to
8    the defendant's credit that he admits I did obstruct justice
9    with respect to the investigation.  Those two points are
10   warranted.
11           And so, Judge, those are the things I wanted to hit
12   from my letter.  Those were described in greater detail there.
13   What I wanted to address with respect to the Court's comments
14   is first of all, with respect to Jen Ridha and the introduction
15   of the Xanax.
16           THE COURT:  Xanax.
17           MR. ANDERSON:  I don't think it is -- I respectfully
18   disagree with the Court that that matter was ever swept under
19   the rug.  She was charged in a complaint.  The complaint was
20   filed publicly --
21           THE COURT:  No.  The complaint was sealed until I took
22   the sealing order off in connection with the David Escalera
23   trial.
24           MR. ANDERSON:  Judge, I believe the --
25           THE COURT:  I think the proceedings were sealed if you
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```

SPA-53

1CL5douS                    Sentence-CORRECTED

1    look on the docket.
2              MR. ANDERSON:  I might stand corrected.
3              THE COURT:  It is my recollection.  I could be wrong
4    but you may remember better than I do.  That is my
5    recollection, that the matter was sealed for pretty long time.
6    It became unsealed at the time of David -- just before David
7    Escalera's trial.  I think that's the history, but.
8              MR. ANDERSON:  Your Honor, I didn't participate in
9    that.  My recollection is that the letters from the government
10   to the Court about that matter were filed under seal but the
11   complaint against her was filed publicly.  It might have been
12   initially sealed before the warrant was executed but then it
13   was unsealed when she was presented in court and then she made
14   an application, in the normal course through the U.S.
15   Attorney's office, we have a deferred prosecution program, that
16   is all pre-indictment, and in the normal course her application
17   was considered there.  And then, when it was approved for
18   deferred prosecution, that matter was brought to a magistrate
19   judge in open court and addressed there.  It also, Judge, would
20   not be normal -- in the normal course her case wouldn't have
21   been brought here anyway.  So, for example, the defendant who
22   has been arrested for introducing contraband into the MCC, he
23   is on a complaint now but when he is indicted in the normal
24   course that will be wheeled out to a judge in this district at
25   random and it might be your Honor, it might be some other judge

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

**SPA-54**

1CL5douS                    Sentence-CORRECTED

1  in the Court.  So, I do think it is unfair and I respectfully
2  disagree that that matter was swept under the rug
3  notwithstanding whether or not you disagree with the leniency
4  of her disposition.
5          Your Honor, I also wish to make clear that while
6  Mr. Douglas was scheduled to testify at the trial of Eduardo
7  Escalera, the government is not seeking his sentence here to
8  reflect in any way whatsoever the fact that he won't be
9  testifying at that proceeding and I wouldn't want the Court to
10 consider it.  He did have a cooperation agreement with the
11 government in connection with his conviction for distributing a
12 controlled substance.  That's separate from this.  This
13 sentence -- the government is asking the Court not to consider
14 the fact that he won't be cooperating further with the
15 government when imposing sentence here.  The obstruction is
16 only based on him not being honest about where the heroin came
17 from that he possessed.
18         And, your Honor, the government has given where -- has
19 given a great deal of thought at various levels in the office
20 about what type of recommendation to make to the Court and the
21 Court knows that often we come in here and just say a sentence
22 within the guidelines is appropriate because in the normal
23 course that is what is appropriate.  Circumstances are well
24 accounted for with all the factors set forth in the guidelines
25 so a sentence in that range would serve the interest of justice

**SPA-55**

1CL5douS                         Sentence-CORRECTED

1    it.

2              Here, after the discussions that we had and after the
3    obstruction was applied, the office does recommend that a
4    sentence at the high end of the range of 18 to 24 months is
5    appropriate in light of basically the recidivism, the fact the
6    message isn't getting through, the fact it has to be a
7    consecutive sentence and the fact that it wasn't candid, he
8    wasn't honest, he lied to us about where the drugs came from.

9              Now, the basis for saying that -- our view is that the
10   defendant should also get acceptance points because he did
11   promptly admit his guilt, waived indictment, all of the things
12   I said before.  He did come to court and in his allocution he
13   admitted the charge, the charge was the possession, and he
14   admitted the truth of that.  Later he did come to accept the
15   fact that he initially obstructed justice with respect to the
16   lie he told about how he came by the drugs.  And that's why it
17   is the government's position that the Court is authorized under
18   United States v. Enrique, 42 F.3d 769, the case the government
19   cited in its letter of December 15th, the Court is authorized
20   to award those two points for acceptance of responsibility, if
21   it chooses.

22             May I have one moment, your Honor?

23             THE COURT:  Yes.

24             (Counsel conferring)

25             MR. ANDERSON:  Unless the Court has any questions for

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SPA-56

56

1CL5douS                    Sentence-CORRECTED
1   the government, the government rests on its submission and
2   statements.
3          THE COURT:  Okay.  That's fine.  Thank you.
4          MR. ANDERSON:  Thank you.
5          THE COURT:  So, I am going to adopt the findings of
6   fact in the presentence investigation report unless defense
7   counsel has any objection.
8          MR. De FEIS:  No, your Honor.
9          THE COURT:  Mr. Douglas, any further objection from
10  you?
11         THE DEFENDANT:  No, sir.
12         THE COURT:  How about from the government?
13         MR. ANDERSON:  None, your Honor.
14         THE COURT:  So, if you give me one minute I am just
15  going to take a quick break and we will come back and preview
16  the sentence and then impose the sentence.
17         (Recess)
18         THE COURT:  So, just one thought.  I am not
19  considering the fact that he is not going to be a witness at
20  the Eduardo Escalera trial in factoring in drafting the
21  sentence, so I appreciate you bringing that to my attention
22  that that was your position as well.
23         So, here is what I intend to do.  Nevertheless, I am
24  going to vary upward and I will cite some authorities for doing
25  so.  I intend to impose a consecutive sentence of 54 months of
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

**SPA-57**

1CL5douS                    Sentence-CORRECTED

1  incarceration followed by three years of supervised release.
2  The supervised release, by law, needs to be concurrent with the
3  supervised release under his -- Mr. Douglas' prior sentence,
4  and I think that that sentence is sufficient but not greater
5  than necessary to accomplish the sentencing goals and meet the
6  criteria of 3553(a).
7           I note that the sentence is outside the guideline
8  range, it is an upward variance, I believe it was warranted,
9  and I incorporate everything I said before but, as a quick
10 summary, defendant continues and has continued to engage in a
11 pattern of reckless, criminal, dangerous, destructive,
12 deceitful conduct even after being afforded a last chance in
13 the sentence imposed by the Court in April 2010 by, among other
14 things, failing to abide by the rules and regulations of the
15 prison facilities and by possessing and using unauthorized and
16 illegal substances and by taking advantage of personal
17 relationships in order to obtain unauthorized substances.  And,
18 as I say, that term of incarceration is to run consecutively
19 with defendant's current term of imprisonment.  Title 18,
20 United States Code, Section 1791(c).  And as for cases, United
21 States v. Rossi, 422 F. App'x (6th Cir. 2011) and the United
22 States v. Knicks, 415 F. App'x (11th Cir. 2011), and also
23 United States v. Pope, 554 F.3d (2d Cir. 2009).
24          The recommendations that I intend to include are the
25 sentence be served at a facility designated by the Bureau of
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

**SPA-58**

```
1CL5douS              Sentence-CORRECTED
```

1    Prisons which offers drug and mental health treatment from the
2    outset, that Mr. Douglas be given a physical and medical
3    examination at the outset, and I am recommending that the
4    Bureau of Prisons lift, immediately, its restrictions on family
5    visits.  I agree with Dr. Weiss who points out that this
6    restriction, in my respectful judgment, is counter-productive.
7            I also intend to impose a fine of $4,000 which is due
8    immediately.  The guideline range for the fine is $4,000 to
9    $40,000.  I do not intend to impose restitution.  There is no
10   victim in the meaning of 18, United States Code, 3663 or
11   3663(a).
12           I also intend to impose a special assessment of $100
13   which is also mandatory and also due immediately under 18,
14   United States Code, Section 3013.
15           The reasons for the sentence are that I compute the
16   guideline range to be 24 to 30 months.  I compute the offense
17   level to be 15.  I recognize that the government and defense
18   counsel feel I have discretion to award acceptance of
19   responsibility but, as I have noted before, I don't think that
20   it is appropriate to do so in this case.  The criminal history
21   category is III.
22           I think this sentence, as I have been trying to make
23   clear, is consistent with all of the factors at 18, United
24   States Code, Section 3553(a) including the nature and
25   circumstances of the offense and history and characteristics of

**SPA-59**

59

1CL5douS                    Sentence-CORRECTED

1   Mr. Douglas.  I am trying to reflect the seriousness of the
2   offense, promote respect for the law, provide a just
3   punishment, afford adequate deterrence to criminal conduct,
4   protect the public from further crimes, provide Mr. Douglas
5   with needed educational or vocational or particularly medical
6   care including drug and mental health treatment or other
7   correctional treatment in a most effective manner.
8           So, that is the sentence I intend, unless defense
9   counsel wishes to add anything at this time?
10          MR. De FEIS:  No, your Honor.
11          THE COURT:  Mr. Douglas, anything further from you?
12          THE DEFENDANT:  No, your Honor.
13          MR. De FEIS:  All I would say is perhaps the same
14  language regarding the residential drug and alcohol program
15  used in the last judgment.
16          THE COURT:  I am going to incorporate by reference --
17          MR. De FEIS:  Yes.
18          THE COURT:  -- all of the terms of supervised release
19  that were used in the last judgment with the exception of the
20  three changes that I have indicated before.  I am happy to do
21  that.
22          Anything further from the government?
23          MR. ANDERSON:  No, thank you, Judge.
24          THE COURT:  So I would ask then, Mr. Douglas, to
25  stand.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

60

1CL5douS                    Sentence-CORRECTED

1           So, the guideline range is 24 to 30 months.  Having
2    considered the factors at 18, United States Code, Section
3    3553(a), it is my judgment that you be committed to the custody
4    of the Bureau of Prisons to be imprisoned for a term of 54
5    months to run consecutive with your current sentence followed
6    by three years of supervised release which runs concurrent with
7    your currently sentenced supervised release.  The supervised
8    release is subject to the following mandatory conditions:  That
9    you not commit another federal, state or local crime; that you
10   not illegally possess a controlled substance; that you not
11   possess a firearm, dangerous weapon or destructive device; that
12   you refrain from any unlawful use of a controlled substance;
13   you be required to submit to one drug test within 15 days of
14   placement on supervised release and at least two unscheduled
15   drug tests thereafter as may be directed by the probation
16   officer.
17           In addition, you are required to comply with what are
18   called standard conditions 1 through 13 plus the conditions of
19   supervision that were included in your April 2010 judgment of
20   conviction which will be included here as well, along with
21   recommendations that the sentence be served at a facility
22   designated by the Bureau of Prisons which offers drug and
23   mental health treatment, also that you receive a physical and
24   medical evaluation and exam, and I am recommending that the
25   Bureau of Prisons lift its restriction on family visits as I

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
                                                          61
     1CL5douS              Sentence-CORRECTED
 1   respectfully believe that they are -- that restriction is
 2   counter-productive.
 3            Also, I am imposing a fine of $4,000, no restitution,
 4   special assessment of $100 all for the reasons that I have said
 5   and the reason for the sentence incorporated in my earlier
 6   comments.  I don't think they need to be repeated at this time.
 7            Does either counsel know of any legal reasons,
 8   starting with the government, why this sentence should not be
 9   imposed as so stated?
10            MR. ANDERSON:  No, Judge.
11            THE COURT:  Mr. De Feis?
12            MR. De FEIS:  No, your Honor.
13            THE COURT:  Then I hereby order the sentence to be
14   imposed as so stated.
15            Mr. Douglas, to the extent that you have not already
16   waived your appeal rights pursuant to the plea agreement which
17   is dated October 18, 2011, I advise you that you have the right
18   to appeal this sentence.  If you are unable to pay the costs of
19   an appeal, you have the right to apply for leave to appeal in
20   forma pauperis.  If you request, the Clerk of Court will
21   prepare and file a notice of appeal on your behalf immediately.
22            Do you understand those appeal rights?
23            THE DEFENDANT:  Yes, your Honor.
24            THE COURT:  Just to clarify, the plea agreement does
25   contain a waiver of the right to appeal directly or indirectly
```

SPA-62

62

1CL5douS                    Sentence-CORRECTED
1   but that waiver is contingent upon a sentence within the
2   guideline range as stated in the plea agreement of 12 to 18
3   months, and even if one could consider that that has been
4   modified by the defense and the government to 18 to 24 months,
5   my sentence is clearly above that and so I don't think there
6   is -- I think there is a right to appeal this sentence.
7           So, were there any open counts the government was
8   seeking to resolve at this time?
9           MR. ANDERSON:  There are none, your Honor.
10          THE COURT:  Does counsel, starting with the
11  government, wish to add anything to today's proceeding?
12          MR. ANDERSON:  No, thank you, Judge.
13          THE COURT:  Mr. De Feis?
14          MR. De FEIS:  No, your Honor.
15          THE COURT:  Then I think that concludes our work for
16  today.
17          Mr. Douglas, as I have done in the past, I do wish you
18  the best of luck going forward.
19                          o0o
20
21
22
23
24
25

SPA-63

AO 245B    (Rev. 09/08) Judgment in a Criminal Case
           Sheet 1

DOCUMENT
ELECTRONICALLY FILED
DOC#:
FILED: 12/21/11

# UNITED STATES DISTRICT COURT

### Southern District of New York

| | |
|---|---|
| UNITED STATES OF AMERICA ) | **JUDGMENT IN A CRIMINAL CASE** |
| **v.** ) | |
| Cameron Douglas ) | Case Number:  S5 09 cr 1082 |
| ) | USM Number: 70707-054 |
| ) | |
| ) | Nicholas DeFeis/Allison Menkes |
| ) | Defendant's Attorney |

## THE DEFENDANT:

☑ pleaded guilty to count(s)    one

☐ pleaded nolo contendere to count(s)
  which was accepted by the court.

☐ was found guilty on count(s)
  after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 USC 1791(a)(2)& | possession of prohibited objects while an inmate of a federal | 10/16/2011 | one |
| (b)(1) | prison | | |

       The defendant is sentenced as provided in pages 2 through    6    of this judgment.  The sentence is imposed pursuant to
the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☐ Count(s)                         ☐ is    ☐ are  dismissed on the motion of the United States.

       It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence,
or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution,
the defendant must notify the court and United States attorney of material changes in economic circumstances.

12/21/2011
Date of Imposition of Judgment

*RMB*

Signature of Judge

Richard M. Berman            U.S.D.J.
Name of Judge               Title of Judge

12/21/2011
Date

SPA-64

DEFENDANT: Cameron Douglas

CASE NUMBER: S5 09 cr 1082

Judgment — Page  2  of  6

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:

54 months (to run consecutive to the term of imprisonment defendant is currently serving). It is recommended that 1) defendant be placed in a facility in which the defendant can receive drug and mental health at the outset; 2)defendant receive a physical and medical examination/evaluation upon admittance;3) BOP lift immediately the restrictions on family visits.

☑ The court makes the following recommendations to the Bureau of Prisons:

It is further recommended that the defendant be placed in a RDAP program if he is eligible in accordance with BOP regulations.

☑ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

    ☐ at _____ ☐ a.m. ☐ p.m.  on _____ .

    ☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐ before 2 p.m. on _____ .

    ☐ as notified by the United States Marshal.

    ☐ as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

a _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

AO 245B    (Rev. 09/08) Judgment in a Criminal Case
          Sheet 3 — Supervised Release

| | |
|---|---|
| DEFENDANT: Cameron Douglas | Judgment—Page ___3___ of ___6___ |
| CASE NUMBER: S5 09 cr 1082 | |

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of :

three years (to run concurrently with defendant's other term of supervised release)

    The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

☐   The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse. *(Check, if applicable.)*

☑   The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon. *(Check, if applicable.)*

☐   The defendant shall cooperate in the collection of DNA as directed by the probation officer. *(Check, if applicable.)*

☐   The defendant shall comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which he or she resides, works, is a student, or was convicted of a qualifying offense. *(Check, if applicable.)*

☐   The defendant shall participate in an approved program for domestic violence. *(Check, if applicable.)*

    If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

    The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

## STANDARD CONDITIONS OF SUPERVISION

1)   the defendant shall not leave the judicial district without the permission of the court or probation officer;

2)   the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;

3)   the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4)   the defendant shall support his or her dependents and meet other family responsibilities;

5)   the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6)   the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7)   the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8)   the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9)   the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10)   the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11)   the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12)   the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and

13)   as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

SPA-66

AO 245B    (Rev. 09/08) Judgment in a Criminal Case
            Sheet 3A — Supervised Release

DEFENDANT:  Cameron Douglas
CASE NUMBER:  S5 09 cr 1082

Judgment—Page  4  of  6

## ADDITIONAL SUPERVISED RELEASE TERMS

1- The Court incorporates by reference (and imposes the conditions) set forth in the Judgment and Commitment Order dated April 20, 2010 with the following modifications:

2- Defendant shall pay an additional $4,000 fine

3- Defendant shall pay an additional $100 special assessment (for this offense).

SPA-67

AO 245B    (Rev. 09/08) Judgment in a Criminal Case
           Sheet 5 — Criminal Monetary Penalties

DEFENDANT:  Cameron Douglas

Judgment — Page   5   of   6

CASE NUMBER:  S5 09 cr 1082

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | **Assessment** | **Fine** | **Restitution** |
|---|---|---|---|
| **TOTALS** | $ 100.00 | $ 4,000.00 | $ 0.00 |

☐  The determination of restitution is deferred until _____.  An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐  The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below.  However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss\*** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
| | | | |

| **TOTALS** | $           0.00 | $           0.00 | |

☐  Restitution amount ordered pursuant to plea agreement  $ _____

☐  The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f).  All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐  The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☐  the interest requirement is waived for the   ☐ fine   ☐ restitution.

    ☐  the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

SPA-68

AO 245B    (Rev. 09/08) Judgment in a Criminal Case
            Sheet 6 — Schedule of Payments

Judgment — Page  6  of  6

DEFENDANT:  Cameron Douglas
CASE NUMBER:  S5 09 cr 1082

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A  ☑  Lump sum payment of $  4,100.00  due immediately, balance due

     ☐  not later than _____ , or
     ☐  in accordance  ☐ C,  ☐ D,  ☐ E, or  ☐ F below; or

B  ☐  Payment to begin immediately (may be combined with  ☐ C,  ☐ D, or  ☐ F below); or

C  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

D  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a term of supervision; or

E  ☐  Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F  ☐  Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

     Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☐  The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.